[No. 5630–5–II.   Division Two.   November 3, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. LEONARD A. HYSTAD, *Appellant.*

*Jon C. Parker,* for appellant.

*Michael G. Spencer, Prosecuting Attorney,* and *John C. Strzynski, Deputy,* for respondent.

PETRICH, C.J.—Defendant appeals his convictions after pleading guilty to attempted first degree robbery, eluding a

police officer, and second degree assault. He also appeals his habitual criminal sentencing. The issues involving the substantive offenses are whether defendant demonstrated that a withdrawal of his guilty plea was necessary to correct a manifest injustice and whether the State's notice of intent to file a habitual criminal allegation fettered defendant's right to testify in the trial of the substantive charges.

In the habitual criminal proceedings, the defendant challenged the court's admission of prior convictions, raising the issues of whether the State met its burden of proving that the defendant's guilty pleas to earlier charges were made knowingly and voluntarily and whether the factual allegations charging a criminal offense for which the defendant was found guilty in a neighboring state would amount to a felony in Washington. We affirm defendant's conviction, but we reverse his habitual criminal sentencing and remand for appropriate sentencing.

After unsuccessfully attempting to rob a pharmacy on April 22, 1980, defendant and an accomplice fled in an automobile. Defendant, ignoring directions by police to stop, fired a gun at the pursuing police vehicle. Nevertheless, defendant was soon captured and charged by information with the above mentioned crimes. He pleaded not guilty. On September 11, about a week after the State filed notice of its intent to file a habitual criminal allegation, and after the court apprised him of his rights and of the consequences involved, defendant changed his plea to guilty. Thereafter the State filed a supplemental information alleging that defendant was a habitual criminal and should be given an enhanced sentence.

At trial on the habitual criminal charges, defendant challenged the supplemental information. He claimed the alleged prior convictions based on guilty pleas did not support habitual criminal status because he had not known the nature and consequences of pleading guilty to the underlying, prior charges, and furthermore, that the factual allegation charging him with a crime in Idaho did not amount to a felony in Washington. The court ruled against him. On

December 15, he also moved to have his guilty pleas to the current charges withdrawn. He argued that at the time he pleaded guilty he had been taking methadone by prescription and that the methadone created a "hangover" effect so that he did not fully understand the consequences of his action. The court also denied this motion. A jury trial was then held on the supplemental information; the jury found that defendant had been convicted of three prior felonies. Defendant now appeals the judgment and sentence.

We first consider defendant's claim that the court erred by not allowing him to withdraw his guilty plea. According to CrR 4.2(f), a trial court shall allow a defendant to withdraw a guilty plea whenever that withdrawal is necessary to correct a manifest injustice, *i.e.,* an injustice that is obvious, directly observable, and not obscure. *State v. Taylor,* 83 Wn.2d 594, 521 P.2d 699 (1974); *State v. Armstead,* 13 Wn. App. 59, 533 P.2d 147 (1975). The manifest injustice requirement is a demanding standard because of the many safeguards surrounding defendant when he pleaded guilty. *State v. Taylor, supra.*

Here, in accord with CrR 4.2(d), defendant was fully advised by the court of his constitutional rights, the consequences of a guilty plea, and the nature of the crimes. In accord with CrR 4.2(g), defendant signed a written guilty plea which also informed him of his rights. There is every reason to believe defendant made his plea voluntarily and knowingly.

Defendant, however, claims one basis of manifest injustice, namely, that his plea was involuntary because of the methadone–created confusion. Such claim is suspect. One week after his guilty plea defendant wrote a letter to the county commissioner stating that he pleaded guilty so that his sentences would run concurrently. Such letter is clearly written, and it suggests that defendant had thought through the tactical reasons for his plea. We must conclude, therefore, that defendant's bald claim of methadone–induced confusion does not meet the demanding standard required to show manifest injustice. *See also State v. Arm-*

*stead, supra* (no involuntary guilty plea where defendant claimed he was "drunk off barbiturates").

We next turn to defendant's claim that the State's notice of intent to file a habitual criminal allegation fettered his constitutional right to testify in his own behalf. As defendant articulates it, he was forced to elect whether he must defend one or more of the current charges by use of his own testimony, knowing that any admission of a prior conviction as impeachment could be used as proof in the habitual criminal proceeding, or remain silent.

For support, defendant turns to *People v. Chavez,* 621 P.2d 1362 (Colo.), *cert. denied,* 451 U.S. 1028, 69 L. Ed. 2d 398, 101 S. Ct. 3019 (1981). Anticipating cross examination about his prior criminal record, Chavez moved to exclude any testimony he might give in defense of the substantive charges from the habitual criminal proceeding. Colorado then interpreted its statutes to say that if a defendant admitted prior convictions, the state was "relieved of the necessity for proving any fact so admitted" in connection with habitual criminal proceedings. The trial court denied the motion by Chavez, who then chose not to testify. Chavez was acquitted on the habitual criminal charges, but found guilty on the substantive charges. On appeal, the court reversed, holding that the trial court's ruling permitted use of admissions of prior convictions obtained by way of impeachment in the trial of the substantive charges as evidence in the habitual criminal proceedings, thus impermissibly burdening the defendant's right to testify on his own behalf; such use relieved the prosecution of its burden in the habitual criminal proceedings of proving the prior convictions beyond a reasonable doubt.

*Chavez* is inapposite to our facts. By pleading guilty, Hystad chose not to defend himself, and he waived *inter alia* his right to testify, to remain silent, and to confront his accusers. Defendant, therefore, was not faced with the choice confronting Chavez. We additionally note that here, in contrast to the Colorado law under consideration in *Chavez,* the introduction of prior convictions in a criminal

trial solely for impeachment purposes does not absolve the prosecution from proving such prior convictions beyond a reasonable doubt in a habitual criminal proceeding. *State v. Holsworth,* 93 Wn.2d 148, 607 P.2d 845 (1980). The prosecution, then, is not relieved of its heavy burden of proof.

We finally turn to defendant's claim that the court erred in allowing three prior convictions to be used in the habitual criminal proceeding. We need only consider his Pierce County and Idaho convictions.[1]

On February 15, 1972, the Pierce County court read to defendant two counts of an information charging Kathleen New and defendant with possessing certain controlled substances.[2] Defendant pleaded guilty to the charges. In the habitual criminal proceedings, however, he claimed that his pleas were involuntary because he was not adequately apprised of the nature of the offense.

■ A conviction which rests upon an involuntary or unknowing plea of guilty is constitutionally invalid. *Boykin v. Alabama,* 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969). Use of the invalid conviction to support habitual

---

[1]The State does not argue in the alternative under RCW 9.92.090 to affirm habitual offender status based on a single prior felony conviction which imposes a penalty of not less than 10 years, and which, under RCW 9.95.010, permits the court to impose a sentence up to life imprisonment.

[2]"THE COURT: Very well. In Cause No. 41713, Mr. Hystad, count one you are charged with the possession of a controlled substance, the charging part of count one of the information reads as follows: The said Kathleen New and Leonard Hystad in the County of Pierce, State of Washington, on or about the 17th day of November 1971, did then and there being unlawfully and feloniously possess a controlled substance, to-wit: Demerol, contrary to the form of the statute in such cases made and provided. How do you plead to count one of the information?

"MR. HYSTAD: Guilty.

"THE COURT: Count two of the information, the charging part alleges that you are guilty of the crime of the unlawful possession of a controlled substance and reads as follows: That the said Kathleen New and Leonard Hystad in the County of Pierce, State of Washington, on or about the 17th day of November 1971, did then and there being unlawfully and feloniously possess a controlled substance, to-wit: Desoxyn, contrary to the form of the statute in such cases made and provided against the peace and dignity of the State of Washington. How do you plead to count two?

"MR. HYSTAD: Guilty."

criminal status is barred by *Holsworth,* which places the burden on the State to prove beyond a reasonable doubt the validity of an earlier conviction once the defendant challenges its use.

> Probably the most important requirement of *Boykin* is that the defendant receive "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process". *Smith v. O'Grady,* 312 U.S. 329, 334, 85 L. Ed. 859, 61 S. Ct. 572 (1941), *quoted in Henderson v. Morgan,* 426 U.S. 637, 645, 49 L. Ed. 2d 108, 96 S. Ct. 2253 (1976); *State v. Holsworth,* 93 Wn.2d 148, 156, 607 P.2d 845 (1980). In particular, this requires that the defendant be aware of the basic elements of the offense charged. *See Henderson v. Morgan, supra* at 646–47; *In re Keene,* [95 Wn.2d 203, 622 P.2d 360 (1980)] at 208–09; *State v. Holsworth, supra* at 153 n.3.

*State v. Chervenell,* 99 Wn.2d 309, 317–18, 662 P.2d 836 (1983). For there to be a truly voluntary guilty plea, the defendant must possess an understanding of the law in relation to the facts. *McCarthy v. United States,* 394 U.S. 459, 22 L. Ed. 2d 418, 89 S. Ct. 1166 (1969).

After carefully reviewing the record of defendant's Pierce County plea, we hold defendant was not adequately informed of the acts which constituted the alleged crime. The court's reference to the details of the alleged crime was simply that "you are charged with the possession of a controlled substance." The declaration that one is in "possession of a controlled substance" is more a conclusion than a statement of fact.

Factual circumstances suggesting culpability for the offense of possessing a controlled substance may very well be innocent conduct. The very nature of the charge creates a substantial potential for the defendant's misunderstanding of the relationship between the facts and the crime charged.

Actual possession wherein the accused is in actual, physical custody of the controlled substance is simple enough. However, a person may be guilty of possession by possess-

ing the controlled substance in law, which may be constructive possession. Constructive possession is established when the person charged has dominion and control over either the drug or the premises where the drug is found. *State v. Callahan,* 77 Wn.2d 27, 459 P.2d 400 (1969). However, mere proximity to the drugs is not enough to establish constructive possession. *State v. Mathews,* 4 Wn. App. 653, 484 P.2d 942 (1971). The fact of temporary residence, personal possessions on the premises, or knowledge of the presence of the drug without more is insufficient to show dominion and control necessary to establish constructive possession of the drug. *State v. Davis,* 16 Wn. App. 657, 558 P.2d 263 (1977). Furthermore, even though neither intent nor guilty knowledge is an element of the crime of possession of a controlled substance, if the defendant can affirmatively establish that his "possession" was unwitting "he had no 'possession' for which the law will convict him." *State v. Cleppe,* 96 Wn.2d 373, 635 P.2d 435 (1981), *cert. denied,* 456 U.S. 1006 (1982).

A greater potential for misunderstanding of the relationship of the facts and the law defining the offense exists here because the defendant was charged along with a codefendant. Defendant may well have been charged as an accomplice, yet mere presence at the scene of a crime is not enough to find a defendant as an accomplice. More is required. *State v. Alford,* 25 Wn. App. 661, 611 P.2d 1268 (1980).

Defendant may have mistakenly considered himself guilty even though his possession of the drug was unwitting. If the basis of the charge is on accomplice liability, defendant may have considered himself guilty merely because he was present when his codefendant either actually or constructively possessed the drug. If the charge was based on constructive possession he may have mistakenly believed himself guilty because of his mere proximity to the drug or because of his temporary residence on the premises when the drug was found. Without some clarification of the facts the State relies upon to establish the defendant's

guilt, there is no way for us to know whether defendant could determine if his acts, in fact, constituted a crime.

Because this plea was pre–*Wood v. Morris,* 87 Wn.2d 501, 554 P.2d 1032 (1976), the State could have introduced extrinsic evidence to show that defendant was properly informed of the acts which he allegedly committed. It did not do so. Thus, because the State did not prove the voluntariness of the Pierce County plea, the resulting conviction does not satisfy the requirements of a conviction for purposes of the habitual criminal proceeding.

██ Defendant also pleaded guilty on June 5, 1974, before an Idaho court to the charge of first degree burglary. The test for determining the sufficiency of an out–of–state conviction is whether the charging instrument stated facts which would have necessarily proved all the elements of a felony in Washington. *State v. Rinier,* 93 Wn.2d 309, 609 P.2d 1358 (1980). The Idaho information simply charged defendant with entering a building at night with the intent to commit larceny. Because it does not inform us whether this building was a dwelling or whether defendant was armed or engaged in the various activities enumerated in the Washington statute, the defendant could not be charged with the crime of first degree burglary under former RCW 9.19.010 then in effect in Washington. In 1974, second degree burglary in Washington involved "breaking" and "entering" a building. Former RCW 9.19.020. However, because the Idaho information does not indicate that defendant gained entry forcibly or by means amounting to a break or breaking as defined in former RCW 9.01.010(20), there are no facts suggesting the required element of "breaking." The court below, therefore, improperly allowed the jury to consider the Idaho conviction.

The failure to establish that defendant was guilty of two felony convictions, as required by RCW 9.92.090, invalidates the habitual criminal determination. We therefore affirm the underlying conviction, but we must reverse the habitual criminal sentencing and remand for the appropriate sentencing for the substantive offenses of attempted

first degree robbery, eluding a police officer and second degree assault.

PETRIE, J., concurs.

REED, J. (dissenting)—I dissent from that portion of our disposition that vitiates the habitual criminal finding and sentence. I do so because there is substantial extrinsic evidence supporting the conclusion that defendant understood the nature of the charge to which he pleaded guilty in 1972. The evidence was sufficient, I believe, to justify the trial judge in finding that the State had carried its burden of proving a valid conviction beyond a reasonable doubt.

I also believe the charge of simple possession of a specified controlled substance is self–explanatory and the court need not conjure up a laundry list of tenuous suppositions and remote possibilities regarding any and all esoteric defenses that might have been available to Hystad. Yet, that is just what the majority has done in this case. Hystad's situation is far removed from that of the defendant in *State v. Powell,* 29 Wn. App. 163, 627 P.2d 1337 (1981), where we vacated a first degree murder plea for lack of the factual basis required by CrR 4.2. In *McCarthy v. United States,* 394 U.S. 459, 22 L. Ed. 2d 418, 89 S. Ct. 1166 (1969), cited by the majority, the Supreme Court, exercising its supervisory powers, construed rule 11 of the Federal Rules of Criminal Procedure. The *McCarthy* Court expressly disavows any reliance upon the constitution. In effect, the majority here measures Hystad's plea by CrR 4.2, which was not effective until July 1973.

At the plea taking in 1972, Hystad's attorney, with whom he had "discussed [the plea change] fully," argued for concurrent sentences as follows:

> MR. ALLOTTA: Your Honor, briefly, there is no question that this man will have to go to the Department of Institutions. I'm handing you up a copy of the violation report. He is already on parole on another charge which will be revoked. I would ask that the court, since this man is a—I get these fellows that are involved in dope at

the beginning stage of the game or at the beginning stage of the action, I try to get them in a program to clear them up. I remember a flare up we had with this man because he was cut off with narcotics, he hasn't had any for awhile up there in the jail, he's a little more sensible now. I think it is a matter of getting him down to the Department of Institutions for him to get some treatment and dry out. I would ask that you have these charges run concurrently rather than consecutively, because I'm sure the minimum they will set on this will give him ample time to clean up the drug problem and hopefully the other felonious actions and, like I say, he is 36 years of age and it appears that the problem is drugs, and that's why he commits the other crimes.

Next, Hystad's trial judge had the benefit of a transcript of the 1975 Clark County proceedings where Hystad engaged in the following colloquy with Judge Skimas:

THE COURT: Do you have a drug problem?
THE DEFENDANT: All my life.
THE COURT: What kind of drugs have you been involved with?
THE DEFENDANT: Opiates.
THE COURT: Have you been on the hard stuff?
THE DEFENDANT: Yes.

. . .

THE DEFENDANT: I took to the poppy when I was a young man.

Also, during his trial on a separate charge of escape Hystad testified on direct examination as follows:

Q In the past years of your life, have you taken narcotic drugs?
A Most of my life, yes. As a young man and throughout my adult life.
Q When did you start taking drugs?
A As a teenager.
Q What kind of drugs did you take?
A Well, all the opiate derivatives, morphine, and some of the stronger ones, like heroin.
Q Heroin?
A Yes.
Q How do you take those kinds of drugs? By pill, or how?

A  Usually intravenously, injected into the blood stream. Some people start out just taking it orally or through the nose, but it always ends up the other way.

. . .

Q  At the present time are you receiving any medication at all?

A  No.

Q  Back in April of this year, when you were arrested, at that time, were you taking any drugs?

A  Yes, I was addicted to narcotics at the time.

Q  After you got out of the hospital following your arrest and came to the jail, did you receive prescribed medication from a doctor?

A  Yes.

Q  What kind of medication?

A  Dolophine.

Q  What is the more common name for that?

A  Methadone. You use it for heroin withdrawal, things of this nature.

Q  What do you mean they use it for heroin withdrawal? How do they use it?

A  Well, for the people that are on methadone programs, they take it orally. It is used because of its long–lasting properties. You know, it doesn't wear off.

Q  So as far as you know, the pills that were being provided to you in the jail, under the prescription were this methadone or whatever the other name is?

A  Dolophine, right.

Q  Was the dosage that you were receiving decreased at any point in time?

A  Yes, it was.

Q  Was that under the doctor's orders?

A  Yes.

Q  Was it ever terminated?

A  Yes, it was terminated before this incident that I am on trial for.

Q  Do you know how long before the doctor's office escapade that they ceased giving you the medication?

A  No, I'm not sure on that, Mr. Parker. This is, you know, four or five months ago, and things were a little

. . .

. . .

A  Things were a little unclear at the time, four or five months ago. Within a few weeks or a month, some-

thing like that.

Q When a person takes heroin or morphine or whatever the other ones that you named were, what effect does it have on them physically?

. . .

Q That is really what I want to know, is what effect it has on you, when you take a shot or pill or something.

A Well, different drugs have different effects, but mainly like your Dolophine was a drug the Germans invented in the Second World War. They ran out of their opiate supplies, and they wanted something for the battle field casualties with long–lasting properties. It is not a pure drug made from poppies. It is a chemical made in the laboratories. It deadens the pain centers in the brain, you know.

Q How does that feel to you, though? What does it feel like?

A It is a euphoric feeling. Not as much so as heroin, or morphine, or some of the other opium derivatives.

In addition, the trial judge considered this letter which defendant wrote to a local county commissioner:

I read in the Aberdeen paper recently that this county used up its court funds and had to ask for further appropriations.

I am a prisoner here and am facing numerous felony charges. Approximately 2 weeks ago I pled guilty to attempted robbery, assault, & eluding a police vehicle. My agreement in pleading guilty was for the court to run the charges together (concurrent). This saves the county the expense of a trial and gives me a minor break on the time structure. After I entered my plea, Mr. Jannhunen [*sic*], the prosecutor filed Habitual Criminal charges. This puts this county through the expense of a trial by jury. Since then I have picked up additional charges of Escape & Burglary. The prosecutor is going to try these charges also. I offer to plead guilty to these charges if the prosecutor will run them concurrent also, and then just send me on to prison. But no, Mr. Jannhunen wants to try me on all charges so he can then try me on the Habitual Offender Act.

The strange part is I will end up doing less time on the Hab. Criminal Act—for a prisoner is released after 7 or 8 yrs. If he accepted guilty pleas and gave me 10–10 & 5

yrs. for the 1st set of charges, and 10 & 10 yrs. on the most recent charges—running concurrent, I would get a 10 year minimum from the parole board, plus I was on parole & it was revoked and I "owe" the state 5 additional years for that. I would have to spend 10 to 12 yrs. in prison this way. Is it any wonder you are short of money for trials?

Mr. Jannhunen goes beyond over–zealousness into vindictiveness. There's no sense or reasoning in his pell mell pursuit of justice. I personally am in the position now where I can't be damaged any more by other charges. I have nothing to lose. I am going to withdraw my guilty plea on the 1st set of charges and have a lengthy jury trial. Then I will be tried on the 2nd set of charges (jury trial) and then Mr. Jannhunen will file Habitual Criminal charges which will bring another jury trial. One man—3 expensive jury trials. I intend to appeal every one of them. The legal cost to this county for me alone will use up the extra 30 thousand plus in dollars appropriated.

The prosecutor could have sent me to prison months ago on a guilty plea. He wants to play "hard guy" and grind his axes, but in reality he isn't "fighting crime"—he is wasting money.

In the last analysis, can there be any doubt that this extremely articulate sophisticate of the drug culture knew exactly what he was admitting to in 1977? I think not. It would indeed be a travesty if we were to loose again upon a society for whom he cares not one whit, an incorrigible, unremorseful predator. The habitual criminal statutes were tailor–made for Mr. Hystad. He has earned the label of habitual criminal and should receive it.

Finally, in exchange for his 1972 guilty plea, and presumably because of his long–standing drug problems, defendant received concurrent sentences. The State also dismissed one other drug possession count, two grand larceny counts, one count of credit card theft and a separate escape charge. I agree heartily with Justice Rosellini's dissent in *State v. Hennings,* 100 Wn.2d 379, 396, 670 P.2d 256 (1983), when he says:

We should not permit a defendant to obtain the benefits of a plea bargaining agreement and then subse-

quently challenge such agreement and obtain the benefit of avoiding habitual criminal status.

The judgment and sentence should be affirmed in all respects.