[No. 7297-1-II.   Division Two.   April 15, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD
B. PORTNOY, *Appellant.*

---

*James M. Marshall* and *Marshall & Goetz,* for appellant (appointed counsel for appeal).

*William H. Griffies, Prosecuting Attorney, Barbara L. Corey–Boulet* and *Chris Quinn–Brintnall, Deputies,* and *Rex Munger, Assistant Deputy,* for respondent.

REED, J.—Ronald Portnoy appeals his convictions of two charges of assault in the second degree, both of which carried special findings that he had been armed with a deadly weapon, a firearm. We affirm.

Portnoy was a Tacoma bail bondsman. In early October 1982 he furnished bail to Gerald Edmundson after meeting with Edmundson, his wife, and his wife's sister–in–law, Nancy Perez. In mid–October Portnoy became concerned because Edmundson had never communicated with him and decided to arrest Edmundson, revoke his bond and return Edmundson to police custody.

Portnoy took a pistol, and, accompanied by an employee, Donald Parker, he went to Edmundson's home in Bonney Lake soon after midnight on October 17, 1982. At Edmundson's house Portnoy gave the pistol to Parker.

When Mrs. Edmundson refused to admit Portnoy and

Parker at the front door, Portnoy told Parker to go around to the back of the house and ensure that Edmundson not escape that way. Nevertheless, Edmundson did escape through a side window and took no part in the ensuing events. Not knowing this, Parker and Portnoy then entered through a door at the back.

After blows were exchanged between Portnoy and Mrs. Edmundson (who asserted that she could not recognize Portnoy because of the dim light), she ran across the street to the home of her brother and sister–in–law, Steven and Nancy Perez. Mrs. Edmundson and the Perezes testified that she awakened them and told them that intruders, whom she did not recognize, had entered her home and attacked her. Steven Perez ran to the Edmundson home, and, brushing Parker aside, entered. He saw Portnoy and grabbed him, striking him and wrestling him quickly to the floor. Perez testified that he heard Portnoy ordering Parker to shoot; he looked up, saw the pistol at his head and let Portnoy go. Parker kept the pistol aimed at him.

Perez's daughter, Anna Marie Perez, then entered, and, seeing the pistol, ran between Parker and her father, pleading with Parker not to shoot him. The father and daughter testified that Portnoy repeatedly told Parker to shoot Steven, and that Parker kept the pistol trained on both of them. Portnoy and Parker denied that Portnoy ordered Parker to shoot Steven Perez, and Parker testified that Portnoy told him only to hold the gun on Steven. Parker also testified that he had lowered the gun when Anna Marie ran in front of him, contradicting Steven's and Anna Marie's testimony. The father and daughter testified that Steven repeatedly asked Portnoy and Parker to identify themselves, and that Portnoy refused, saying he did not have to identify himself, and threatened them with jail for interfering with him. Nancy Perez, Steven's wife, then entered and recognized Portnoy as Edmundson's bail bondsman. The altercation subsided, and Portnoy and Parker left.

Portnoy and Parker were both charged with assault in

the second degree on Steven Perez, assault in the second degree on Anna Marie Perez, and first degree criminal trespass. Portnoy alone was also charged with simple assault on Mrs. Edmundson. The second degree assaults were alleged to have been committed with a pistol, in violation of the deadly weapon statute (RCW 9.95.040) and the firearm statute (former RCW 9.41.025 (codifying Laws of 1982, 1st Ex. Sess., ch. 47, § 1, p. 1321)).

The defense successfully argued that Portnoy, as a bail bondsman, had a contractual right to break into the home of the person whom he had bonded in order to arrest him and revoke the bond. The court therefore dismissed the charge of criminal trespass.

Parker pleaded guilty to a reduced charge of attempted second degree assault, without a deadly weapon or firearm charge, and testified for the State. The court permitted him to testify to his plea bargain, but forbade the defense to cross-examine him so as to elicit the information that the firearm enhancement charge that Portnoy still faced required a mandatory minimum imprisonment.

Other rulings of the trial court to which Portnoy assigns error will be noted in the course of our discussion.

The jury convicted Portnoy of both second degree assault charges and made special findings of firearm enhancement. It acquitted Portnoy of simple assault on Mrs. Edmundson.

I

Portnoy first argues that it was improper to admit Parker's testimony that he had pleaded guilty. He asserts that this testimony was offered to impeach Parker's own testimony about the events of October 17, 1982—testimony that Portnoy justifiably regards as exculpatory of them both. See ER 609. If it does impeach Parker, its value for that purpose must be balanced against the prejudice to the defendant. State v. Alexis, 95 Wn.2d 15, 18–19, 621 P.2d 1269 (1980).

We find no merit in this assertion. The evidence was not offered to impeach the credibility of Parker's (and Port-

460

noy's) account of events. It was properly before the jury so that all of Parker's testimony could be intelligently evaluated. *State v. Long*, 65 Wn.2d 303, 311, 396 P.2d 990 (1964), *cert. denied*, 382 U.S. 961, 15 L. Ed. 2d 364, 86 S. Ct. 442 (1965).

II

Portnoy argues that if Parker's testimony was admissible, the defense should have been permitted to fully cross–examine Parker on his motivation for his plea bargain, including the enhanced sentencing that he had escaped, but that Portnoy still faced. The State argued at trial, as it argues here, that the information was correctly kept from the jury, because the jury should have no knowledge about the sentence to which a conviction might lead. The State offers no authority for this proposition except WPIC 1.02:

> You have nothing whatever to do with the punishment to be inflicted in case of a violation of law. The fact that punishment may follow conviction cannot be considered by you except insofar as it may tend to make you careful.

WPIC 1.02, in relevant part. The State's position is not well founded. This instruction is no more than a correct statement of the common law.

> In the absence of a statute authorizing or requiring the jury to fix the punishment to be inflicted upon a finding of guilt in a criminal case, the punishment is fixed by the trial court and governed by the laws in force . . .

(Footnote omitted.) 75 Am. Jur. 2d *Trial* § 423 (1974). In addition,

> At common law the jury in criminal proceedings either returns a special verdict, setting forth all the circumstances of the case and praying the judgment of the court, or a general verdict of guilty or of not guilty. The punishment is fixed by the court and governed by the laws in force; the defendant is not entitled to have his penalty assessed by the jury.

(Footnote omitted.) 21 Am. Jur. 2d *Criminal Law* § 600 (1981).

■ It is therefore correct to instruct the jury that it is

not its province to grant clemency or mercy, and that it has nothing to do with the punishment to be inflicted if the defendant is found guilty. *State v. Lunsford,* 163 Wash. 199, 205–06, 300 P. 529 (1931). Neither should the jury discuss or consider the subject of punishment. *State v. Hartwig,* 45 Wn.2d 76, 81, 273 P.2d 482 (1954); *accord, Pittman v. United States,* 368 F.2d 560, 561 (9th Cir. 1966), *cert. denied,* 386 U.S. 995, 18 L. Ed. 2d 343, 87 S. Ct. 1314 (1967); *State v. Koch,* 138 Ariz. 99, 673 P.2d 297, 303 (1983). However, we are referred to, and find, no authority suggesting that the State has the right to keep from the jury the extent of the punishment the defendant will face if found guilty, assuming that information is otherwise relevant.

■ First, the preventive instruction of WPIC 1.02 is always available. Second, Washington protects the right to full cross examination into the extent of a plea bargain and the motives for a guilty plea when an accomplice or codefendant testifies for the State.

> The right of cross–examination allows more than the asking of general questions concerning bias; it guarantees an opportunity to show *specific* reasons why a [codefendant] witness might be biased in a particular case.

(Italics ours.) *State v. Brooks,* 25 Wn. App. 550, 551–52, 611 P.2d 1274, *review denied,* 93 Wn.2d 1030 (1980). Such cross examination is the price the State must pay for admission of a codefendant's testimony to that plea. The jury needs to have full information about the witness's guilty plea in order to intelligently evaluate his testimony about the crimes allegedly committed with the defendant. Unfair prejudice is avoided by this opportunity for full cross examination. *State v. Redden,* 71 Wn.2d 147, 149–50, 426 P.2d 854 (1967) (citing with approval *State v. Long,* 65 Wn.2d at 311). The trial court therefore erred in forbidding that cross examination.

■ Further, such an error is of constitutional magnitude because it infringes upon the defendant's Sixth Amendment right to confront witnesses testifying against him.

*Delaware v. Van Arsdall,* ___ U.S. ___, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986); *see also Davis v. Alaska,* 415 U.S. 308, 318, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). This error requires reversal unless it has been shown to have been harmless beyond a reasonable doubt. *Delaware v. Van Arsdall, supra; Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R. 3d 1065 (1967).

> Whether such an error [in preventing cross examination that might reveal bias of a prosecution witness and impeach his credibility] is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether *the testimony was cumulative,* the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross–examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall,* 106 S. Ct. at 1438.

When this test for constitutional harmless error is applied, the evidence is that Portnoy, by his own testimony, as well as by that of Parker, ordered Parker to raise the pistol and keep it trained on the Perezes. Second degree assault may be committed by an act that reasonably would induce apprehension of harm, even without a showing of such apprehension or a showing of an intent to harm. *State v. Frazier,* 81 Wn.2d 628, 630–31, 503 P.2d 1073 (1972). That the Perezes were frightened when so threatened, and that they feared with reason is patent. A clear showing of guilt of the assault charges was made out by Portnoy's testimony alone, even without reference to the Perezes's testimony to even more blameworthy actions. Thus, when the overall strength of the State's case is considered, the court's error was harmless beyond a reasonable doubt.

In addition, Portnoy was not convicted because of any contradiction between his account of events and that of Parker. Their versions were largely the same; Portnoy thus had nothing to gain by impeaching Parker's credibility as to the actions they had taken. The object of eliciting informa-

tion about the motive for a plea bargain must be to impeach the hostile witness's testimonial credibility. *Delaware v. Van Arsdall, supra; Davis v. Alaska, supra.* Portnoy's cross examination of Parker clearly was not intended to impeach Parker's account of the *facts*. Rather, it was calculated to reveal that Parker had chosen not to stand on Portnoy's *legal theory* that, as bail bondsmen, they had a special defense to the assault charges. See section V below.

At best, had Portnoy been permitted the cross examination that he desired, he might have shown that Parker had abandoned this theory and had pleaded guilty only from fear that it would not save him from conviction of the crimes with which he first had been charged. This tactic, however, would not have been the attack on the *credibility* of the prosecution witness that the Sixth Amendment guarantees. On this ground, too, we hold that, although the court erred in preventing full cross examination, the error was harmless beyond a reasonable doubt.

## III

Portnoy contends that a deadly weapon sentencing enhancement is imposed unconstitutionally on an accomplice in a second–degree assault when only the other accused assailant actually possessed and displayed the weapon. He relies on the opinion of the United States Supreme Court in *Enmund v. Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), in which the Court held that imposition of a death penalty on a person who aided and abetted a felony, in the course of which a murder was committed by another felon, but who did not himself kill, attempt to kill, or intend to kill, violated the Eighth and Fourteenth Amendments. *Enmund,* 458 U.S. at 793.

Portnoy's reliance on *Enmund* is very much misplaced. There the Court considered the constitutionality of capital punishment only, in one context only, and ruled that the felon–murderer's punishment must stop short of death, because his death would serve none of the acknowledged purposes of capital punishment. *Enmund,* 458 U.S.

at 801. Even if the principle could be applied to assault, the facts are not analogous: the evidence of Portnoy's order to Parker shows that Portnoy directed Parker to commit a crime. Portnoy therefore offers us no reason to reexamine our rule that firearm sentencing enhancement is not cruel and unusual punishment. *State v. Rose,* 7 Wn. App. 176, 183, 498 P.2d 897, *review denied,* 81 Wn.2d 1008 (1972), *cert. denied,* 414 U.S. 835, 38 L. Ed. 2d 70, 94 S. Ct. 177 (1973).

However, Portnoy advances two related arguments. First he argues that under article 1, section 14 of the state constitution, "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted", and relies on *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980). There, our Supreme Court found that a habitual criminal life sentencing scheme, when applied to a recidivist, who had committed only property crimes of small value, mandated a sentence that was markedly disproportionate to the sentences that otherwise would be imposed on one who committed those crimes, and therefore was cruel punishment under the state constitution. Portnoy argues that this analysis should be applied because of the difference between his sentencing and that of Parker, who escaped the mandatory minimum for deadly weapon use, even though it was Parker who actually held the pistol.

However, the opinion in *Fain* offers no such support. The court's concern in *Fain* was that when minor crimes are punished with life imprisonment because of a defendant's status as a habitual offender, the state constitutional prohibition of cruel punishment is violated. *Fain,* 94 Wn.2d at 400. Portnoy was not sentenced differently from Parker because of a different criminal history, but rather because Parker was charged with a different crime. There is therefore no violation of the state constitution because of a sentencing disproportionate to the offense.

In addition, Portnoy argues that the disparity of sentencing between him and Parker violates the equal protection guaranties. However, "the test for determining whether

the disparity in sentencing between . . . two defendants is violative of equal protection is whether there is a 'rational basis' for differentiation between the defendants." *State v. Bresolin,* 13 Wn. App. 386, 397, 534 P.2d 1394 (1975), *review denied,* 86 Wn.2d 1011 (1976).

On the basis of credible testimony before the court, the State and the court could believe that Parker's part in the crimes, though apparently central merely because he held the pistol, was actually ancillary to that of Portnoy, who had given Parker the pistol and later requested or ordered him to raise it, and keep it raised, against Steven and Anna Marie Perez. Portnoy's conduct rationally could have been found to be the more dangerous and the more deserving of prosecution and mandatory imprisonment. *See State v. Turner,* 31 Wn. App. 843, 847–48, 644 P.2d 1224, *review denied,* 97 Wn.2d 1029 (1982). A rational basis for distinguishing between Parker and Portnoy existed, and equal protection was not violated.

### IV

█ Portnoy contends that the court erred in instructing on the liability of an alleged accomplice for his codefendant's use of a firearm. First, he argues that it failed to instruct the jury properly on the State's burden of proof at *every* point in the instructions at which complicity in firearm use was to be determined. However, Portnoy did not object to the jury instructions on this basis at trial. We may refuse to review any claim of error which was not raised in the trial court, unless the claimed error is manifest and of constitutional magnitude. RAP 2.5(a); *Wilson v. Steinbach,* 98 Wn.2d 434, 440, 656 P.2d 1030 (1982). Portnoy advances no reason to conclude that any error was of constitutional magnitude, let alone manifestly so. Portnoy's other arguments against these instructions are unsupported and meritless.

### V

█ The defense unsuccessfully requested jury instructions on self–defense suggesting that a bail bondsman has a

broader justification for the use of force than do other private citizens. He offered no argument or authority in support of these instructions: "[T]he theory of that [sic] is they properly describe the true self–defense rights to [sic] this particular defendant . . ." It is true that a bail bondsman has certain extraordinary powers under the common law, as the result of his contract with his client. *See Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 21 L. Ed. 287 (1873). However, Portnoy offers no authority for the proposition that the bondsman may sweep from his path all third parties who he thinks are blocking his search for his client, without liability to the criminal law. We decline to consider the issue further. CrR 6.15(c); *State v. Robinson*, 92 Wn.2d 357, 361, 597 P.2d 892 (1979); *State v. Brown*, 36 Wn. App. 166, 170, 672 P.2d 1268 (1983). For the same reason, we decline to review the asserted error in refusing an instruction that evidence of Parker's guilt was not necessarily evidence of Portnoy's guilt.

## VI

■ At the conclusion of the trial Portnoy moved to dismiss all charges on the ground that the State had failed to establish a prima facie case for the consideration of the jury. The trial court correctly denied this motion: it may be made only before the defense presents evidence, and, if it is denied, the defense waives the motion by presenting any evidence. *See State v. Wilson*, 74 Wn.2d 243, 248, 444 P.2d 141 (1968), *cert. denied*, 395 U.S. 903, 23 L. Ed. 2d 217, 89 S. Ct. 1741 (1969).

## VII

■ Finally, the defense moved to dismiss on the ground that the prosecution had failed to elicit testimony that the crimes took place in Pierce County, the trial court's venue. The trial court denied the motion, and took judicial notice that Bonney Lake is in Pierce County. The trial court did not err in taking discretionary judicial notice of the location of Bonney Lake. *See Teig v. St. John's Hosp.*, 63 Wn.2d 369, 376, 387 P.2d 527 (1963); *see also* ER 201.

## VIII

Finding no error, or finding error harmless beyond a reasonable doubt, we affirm.

WORSWICK, C.J., and ALEXANDER, J., concur.

Reconsideration denied May 22, 1986.

Review denied by Supreme Court September 2, 1986.