THE STATE OF WASHINGTON, *Respondent,* v. ANGEL AMEZOLA, ET AL, *Defendants,* GUDELIA MORALES–RAMIREZ, *Appellant.*

*Anne E. Roberts* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *David H. Smith, Deputy,* for respondent.

PEKELIS, J.— Gudelia Morales–Ramirez (Ramirez) appeals her conviction for possession of heroin with intent to deliver. She alleges that the trial court erred (1) in denying her motion to suppress evidence on the ground that the police violated RCW 10.31.040, the "knock and announce" rule, (2) in denying her motions to sever offenses and defendants, (3) in giving the "to–convict" and accomplice instructions and in refusing to give three of her proposed instructions regarding dominion and control and constructive possession. She also contends that the trial court erred (4) in denying her motions to dismiss because there was insufficient evidence to support her conviction for posses-

sion of heroin with intent to deliver, and (5) in imposing an exceptional sentence under the Sentencing Reform Act of 1981 (SRA). We reverse and remand.

## I
### FACTS

In count 1 of an information filed December 27, 1984, Angel Amezola and Jonathan Peraza were each charged with delivery of a controlled substance for a drug sale which occurred on December 21, 1984. In count 2 of the same information, Amezola, Peraza, Francisco Domingo Garcia, and Ramirez, who was Garcia's live–in companion, were each charged with possession with intent to manufacture or deliver a controlled substance.[1]

The four defendants moved to suppress all evidence resulting from a search of the residence where they were living, on the ground that the police violated RCW 10.31-.040, the "knock and announce" rule. At the suppression hearing, the court heard the testimony of law enforcement officials who had participated in the arrest of Amezola and Peraza and in the search of the residence.

Detective Glenn Edmondson of the King County Department of Public Safety's Drug Enforcement Unit (DEU) testified that in November 1984 the DEU, along with the United States Drug Enforcement Administration (DEA), began a joint surveillance of activity at a residence in south Seattle. On seven occasions between November 24 and December 19, Edmondson and other officers called the house and arranged to buy heroin in one–half gram quantities for $175. Typically, Edmondson, calling himself Larry, would phone the house to arrange a buy. A male voice would answer the phone, ask if he had the money, and arrange a meeting at a nearby location, usually a grocery store parking lot. Several minutes later the buy would occur, with Edmondson and two Hispanic males, one of whom was Amezola, exchanging the money for the heroin.

---

[1] We address the appeal of Garcia in a separate unpublished opinion. *State v. Amezola,* 49 Wn. App. 1002 (1987).

Based on these facts a search warrant was obtained.

On December 21, 1984, the day the search warrant was executed, Edmondson twice called the house to order heroin. The first buy was completed, but after the second buy, which occurred at approximately 10 p.m., Amezola and Peraza, who had made the delivery, were arrested and the key to the house was confiscated.

Around 11 p.m. that evening, the search warrant was executed by DEU and DEA personnel. The officers knew someone was home because the lights were on, one of the cars used during the buys was parked there, and they heard movement inside. They had received a tip that the residents might be armed, and three officers went to the rear of the house and three went to the front. Edmondson knocked on the front door three times, each time announcing that he was a King County police officer with a search warrant. When there was no response, one of the officers opened the door with the key previously seized and the officers entered. It was approximately 30 to 60 seconds from the first knock until their entry. The court denied the motion to suppress, finding that there had been an implicit denial of entry and no violation of RCW 10.31.040.

At trial, the officers testified regarding the arrest of Ramirez and Garcia and the search of the house. Ramirez and Garcia, dressed in nightclothes, were coming from the back of the house toward the front door as the officers entered. The two were arrested and detained in the living room while the house was searched. There was no heroin found on either Ramirez or Garcia or in the back bedroom which they shared. However, the officers found over $6,000 in United States funds, as well as some Guatemalan and Mexican currency in their bedroom. Quantities of heroin were discovered in a closet in the front bedroom, which was shared by Amezola and Peraza, as well as in a hollowed-out compartment of the bedroom door. Although the top of the door to Ramirez's and Garcia's bedroom had a similar compartment, it was empty. The officers also found weapons, ammunition, a cocaine kit, scales, papers belonging to Gar-

cia, and more cash. Over $15,000 in United States currency was found in the front bedroom along with the heroin, and $343 in United States currency and $5,300 in Mexican pesos in Garcia's wallet. None of the officers involved in either the surveillance operation or the search had ever seen, spoken with, or heard of Ramirez until her arrest.

Before trial, Peraza and Amezola pleaded guilty to possession of a controlled substance in exchange for their agreement to testify against Ramirez and Garcia and to provide information to the police. Amezola's testimony described the drug operation in detail. He related that in October 1984, he was offered a job selling heroin in the Seattle area. He was given the address and phone number of a house in south Seattle out of which he was to be based. When Amezola arrived from Southern California, Garcia directed him where to go, and told him to charge $350 for 1 gram of heroin. After the first week, Peraza, Amezola's friend, arrived from Southern California to assist him.

About $30,000 worth of heroin was being fronted to them per week. Amezola and Peraza delivered the heroin for the 10 to 20 telephone orders which Garcia received each day. Often, Ramirez was nearby when Garcia told Amezola and Peraza where to make a delivery. Although they never used the word "heroin" they would use the Spanish words for "pieces" and "gram." Amezola and Garcia each usually received $2,500 a week. Peraza's share was between $700 and $1,000, while Ramirez received nothing.

Garcia, who paid the rent and utilities bills, supplied the heroin, arranged deliveries, and occasionally flew to Southern California for the day to make a buy. On the one occasion that Ramirez accompanied Garcia, it was because the apartment that she and Garcia shared in Long Beach had been robbed and she was going to check on it. Amezola testified that Ramirez had nothing to do with the heroin which Garcia brought back.

Amezola also related that he, Garcia, and Peraza would sit in the kitchen and cut the fronted heroin up into gram and one-half-gram packages with a razor and a regular

kitchen knife. Ramirez was often in the kitchen, cooking or washing dishes, during the 30 minutes that this process would take, and the others made no attempt to hide this activity from her. However, both Amezola and Peraza testified that Ramirez was not in any way involved with the drug dealing, and that her job was to cook the meals. She never packaged, cut, or handled the heroin, never went on deliveries, and never answered the phone. Outside of cooking the meals, Ramirez usually stayed in her room, either watching television or sleeping. She never left the house other than to go grocery shopping. There was no other testimony regarding Ramirez's involvement.

After the State rested, Ramirez moved to dismiss the charge against her and also renewed her motion to sever defendants. The court denied both motions. Ramirez, like Garcia, did not present a case in chief. The jury found her guilty of possession with intent to deliver heroin.

Ramirez filed a motion for arrest of judgment on the ground that there was insufficient proof of possession, a material element of the crime. The motion, argued at the sentencing hearing, was denied by the trial court which concluded that there was substantial evidence to support a finding of constructive possession. Following the prosecutor's recommendation, the court imposed an exceptional sentence above the standard range of 12 to 14 months, sentencing Ramirez to 36 months in prison.

## II
### SUPPRESSION OF THE EVIDENCE

Ramirez contends that the evidence seized during the search should have been suppressed. She argues that police did not comply with the "knock and announce" rule, codified in RCW 10.31.040,[2] which provides:

> To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure,

---

[2]The rule also enjoys federal constitutional status. *State v. Larson,* 26 Wn. App. 564, 570, 613 P.2d 542 (1980).

if, after notice of his office and purpose, he be refused admittance.

While the statute specifically applies to arrest warrants, it may also apply to search warrants. *State v. Jones,* 15 Wn. App. 165, 166, 547 P.2d 906 (1976). The purposes of the rule, applicable not only when force is used to obtain entry, but also whenever police enter without valid permission, are (1) reduction of potential violence to both occupants and police arising from an unannounced entry, (2) prevention of unnecessary property damage, and (3) protection of an occupant's right to privacy. *State v. Coyle,* 95 Wn.2d 1, 5, 621 P.2d 1256 (1980). To comply with the rule, the police must, prior to a nonconsensual entry, (1) announce their identity, (2) demand admittance, (3) announce the purpose of their demand, and (4) be explicitly or implicitly denied admittance. *Coyle,* at 6.

The criminal motions judge ruled:

> [T]he failure of response in the time that elapsed during the period of the knock and announcement . . . is an implied or implicit denial, at least, for admittance purposes.

Ramirez argues that the evidence relied on by the trial court is not sufficient to protect her constitutional right against unreasonable searches and seizures because the State did not carry its burden of showing that the officers gave her and Garcia a reasonable amount of time to answer the door.

There is no requirement of an affirmative refusal of admittance. Whether the officer waited a reasonable time before entering the residence is a factual determination to be made primarily by the trial court on a case by case basis. *State v. Woodall,* 32 Wn. App. 407, 411, 647 P.2d 1051 (1982) (quoting *Jones,* at 167), *rev'd on other grounds,* 100 Wn.2d 74, 666 P.2d 364 (1983); *State v. Larson,* 26 Wn. App. 564, 570, 613 P.2d 542 (1980). Although we attach significant weight to the trial court's findings of fact, we must, where a constitutional right is at stake, conduct our own independent review of the record. *Larson,* at 570.

While the court here did not enter formal findings and conclusions as is required by CrR 3.6, Ramirez and the State agree that the officers waited a minimum of 30 seconds, and most likely 1 full minute, before entering. A wait of only 10 or 12 seconds has been upheld as reasonable, *Jones,* at 166–67, as has a wait of 30 seconds. *State v. Lomax,* 24 Wn. App. 541, 543–44, 603 P.2d 1267 (1979). It also appears that the officers had reliable information implicating the residence as a place of drug activity. Further, the hour was late and the lights were on, some movement inside was detected, and it would have been easy to quickly dispose of the heroin. In addition, a car that had been used for deliveries was in the driveway, and there was a tip by an informant that the residents may have been armed. Under these facts, there was ample evidence that the officers gave notice of their presence and purpose and waited a reasonable time before entering. Thus, the court did not abuse its discretion in determining that there was an implicit denial of admittance and that the officers had complied with the "knock and announce" rule when they entered.[3]

### III
#### SUFFICIENCY OF THE EVIDENCE AND RELATED JURY INSTRUCTIONS

■ Ramirez was charged with possession with intent to manufacture or deliver a controlled substance in violation of RCW 69.50.401(a). The State proceeded at trial to prove possession with intent to deliver heroin upon two theories: constructive possession and accomplice liability. Ramirez argues that the trial court erred in denying her motions to dismiss because there was insufficient evidence to support

---

[3]We need not reach Ramirez's argument that there were not sufficient exigent circumstances to excuse noncompliance with the "knock and announce" rule because the circumstances here support the determination that the officers complied with the rule. Further, Ramirez contends that the officers should have been required to knock and announce in Spanish. However, she has not cited any authority for this proposition, and thus we will not consider it on appeal. *State v. Portnoy,* 43 Wn. App. 455, 466, 718 P.2d 805 (1986).

her conviction under either theory, and thus her due process rights were violated. In reviewing the sufficiency of the evidence to support a criminal conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Smith,* 106 Wn.2d 772, 781, 725 P.2d 951 (1986); *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

## A
### Constructive Possession

Ramirez first contends that the court erred in denying her motion to dismiss because the State did not establish the dominion and control necessary to prove her constructive possession. Possession of property may be either actual or constructive. Actual possession means that the goods are in the personal custody of the person charged with possession, while constructive possession is established when the person charged with possession has dominion and control over either the drug, *State v. Callahan,* 77 Wn.2d 27, 29, 459 P.2d 400 (1969), or the premises, *State v. Davis,* 16 Wn. App. 657, 659, 558 P.2d 263 (1977). Exclusive control is not necessary to establish constructive possession, *State v. Wheatley,* 10 Wn. App. 777, 779, 519 P.2d 1001 (1974), but mere proximity to the drugs without more is insufficient to show the dominion and control necessary to establish constructive possession, *State v. Hystad,* 36 Wn. App. 42, 49, 671 P.2d 793 (1983).

In *State v. Partin,* 88 Wn.2d 899, 567 P.2d 1136 (1977), the court rejected the idea that the presence of certain specific indicia, such as possession of keys or payment of rent, will necessarily establish dominion and control, and instead stated:

> [W]e will look at the *totality of the situation* to determine if there is substantial evidence tending to establish circumstances from which the jury can reasonably infer that the defendant had dominion and control of the drugs and thus was in constructive possession of them.

*Partin,* at 906.

One of the indicia of constructive possession is evidence that the defendant resides at the premises and is not merely visiting. *E.g., Callahan,* at 31 (2 or 3 days insufficient); *Davis,* at 658 (temporary residence insufficient). Clearly, Ramirez resided at the residence, and there was an inference from the evidence that she was free to use the premises. These facts, combined with the fact that the drugs were not kept out of her presence, were sufficient to support a finding of constructive possession.[4] *State v. Gonzales,* 46 Wn. App. 388, 403, 731 P.2d 1101 (1986).

Ramirez further contends that the court's instructions on dominion and control and constructive possession were not complete because they did not sufficiently explain the meaning of the phrase "dominion and control," which she claims is a term of art requiring definition. Ramirez's proposed instructions set forth the various factors which the courts have considered in determining whether there has been dominion and control. In addition, she proposed an instruction defining "dominion" as "title to an article of property which arises from the power of disposition and the right of claiming it."

The trial court has considerable discretion in deciding how many instructions to give, *State v. Markham,* 40 Wn. App. 75, 86, 697 P.2d 263, *review denied,* 104 Wn.2d 1003 (1985), and how they are to be worded, *State v. Krup,* 36 Wn. App. 454, 461–62, 676 P.2d 507, *review denied,* 101 Wn.2d 1008 (1984). Instructions are sufficient if they correctly state the law, are not misleading, and permit counsel to argue his or her theory of the case. *State v. Mark,* 94 Wn.2d 520, 526, 618 P.2d 73 (1980); *Krup,* at 461–62. While

---

[4]We do not reach the issue of whether constructive possession in itself can also be used to prove the "intent to deliver" element of the crime charged as the issue is not sufficiently presented to us. *See State v. Perry,* 10 Wn. App. 159, 161, 516 P.2d 1104 (1973). The State seems to assume that if the quantities involved are large enough one may constructively possess a controlled substance *with the intent to deliver.* However, the State relies mainly on the theory of accomplice liability to prove the element of intent to deliver.

the trial court in a criminal case is required to define technical words and expressions, it need not define words and expressions which are of common understanding. Whether words used in an instruction require definition is necessarily a matter of judgment to be exercised by the trial court. *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 106 S. Ct. 1208 (1986); *State v. Castro,* 32 Wn. App. 559, 564–65, 648 P.2d 485, *review denied,* 98 Wn.2d 1007 (1982). Thus far our courts have not treated "dominion and control" as a technical phrase or term of art, and we decline the invitation to do so. The instructions given to the jury on constructive possession correctly stated the law, were not misleading, and entitled Ramirez to argue her theory of the case. There was no abuse of discretion.

## B
### Accomplice Liability

We next address Ramirez's contention that there was insufficient evidence for the jury to find guilt based on accomplice liability and therefore that theory should not have been submitted to the jury. A person is guilty of a crime if he or she is an accomplice of another person in the commission of the crime. RCW 9A.08.020(2)(c). The court's instruction 16 reads as follows:

> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.
> A person is an accomplice in the commission of a crime, if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word "aid" means all assistance whether given by words, acts, encouragement or support. A person who is present at the scene and is ready to assist by his or her presence is aiding in the commission of the crime.

Ramirez objected to this instruction as an incomplete statement of the law because it failed to tell the jury that

mere presence at and knowledge of the crime are insufficient to convict.

█ While instruction 16 is a correct statement of the law, Ramirez is correct that physical presence and assent alone are insufficient to establish accomplice liability. *In re Wilson,* 91 Wn.2d 487, 491, 588 P.2d 1161 (1979). To prove that one present at the commission of a crime is an accomplice, the State must establish that one is ready to assist in the commission of the crime. *State v. Rotunno,* 95 Wn.2d 931, 933, 631 P.2d 951 (1981); *Wilson,* 91 Wn.2d at 491. Stated differently, "[o]ne does not aid and abet unless, in some way, he associates himself with the undertaking, participates in it as in something he desires to bring about, and seeks by his action to make it succeed." *Wilson,* at 491 (quoting *State v. J–R Distribs., Inc.,* 82 Wn.2d 584, 593, 512 P.2d 1049 (1973), *cert. denied,* 418 U.S. 949 (1974)). The State need not prove that the accomplice has the identical mental state as that of the principal. Rather, knowledge that his or her activity will promote or facilitate the commission of the crime is all that is required. *State v. Bockman,* 37 Wn. App. 474, 491, 682 P.2d 925 (1984); *accord, State v. Guloy, supra* at 431; RCW 9A.08.020(3)(a).

Ramirez argues that her motion to dismiss should have been granted because the evidence does not show that she in any way aided in the commission of the charged crime or even knew there was criminal activity. The State argues that her cooking and cleaning enabled the others to deliver the heroin, calling her role an "important if somewhat unglamorous part of the distribution scheme." We cannot agree. Although we view the evidence in a light most favorable to the State, there is not even an inference of Ramirez's liability as an accomplice. The mere performance of domestic tasks which, at most, might have made life easier for those committing the crime, is hardly conduct sufficient to expose one to criminal liability. Ramirez' cooking and cleaning are activities totally distinct from and incidental to the criminal acts charged here. Her connection to the latter is no more than physical presence and assent,

both insufficient to establish accomplice liability for possession of a controlled substance with intent to deliver. Thus, the trial court erred in submitting the issue of accomplice liability to the jury as there was insufficient evidence to support this theory. *See Smith,* at 781; *Green,* at 221.

Although there may have been sufficient evidence to find Ramirez guilty under the constructive possession theory, we cannot determine whether the jury based its verdict on constructive possession or accomplice liability because instruction 8, the "to–convict" instruction, allowed the jury to convict on either of these theories.[5] Where, as here, the jury is presented with alternative means of committing a crime, jury unanimity is not required as long as there is substantial evidence of both alternatives.[6] *State v. Arndt,* 87 Wn.2d 374, 376–77, 553 P.2d 1328 (1976); *accord, State v. Petrich,* 101 Wn.2d 566, 569, 683 P.2d 173 (1984); *State v. Stephens,* 93 Wn.2d 186, 190, 607 P.2d 304 (1980). Since, as analyzed above, the evidence was insufficient to support the accomplice alternative, the error cannot be said to be harmless and the conviction must be reversed and the case remanded for retrial on the State's constructive possession theory only.

Given our disposition of the case and the affirmance of Garcia's conviction, we do not address the issues of severance or sentencing. In summary, we have determined that there was no violation of the "knock and announce" rule, that there was sufficient evidence to convict Ramirez of

---

[5]Instruction 8 provided in relevant part:

"To convict the defendant Gudelia Morales–Ramirez of the crime of possession with intent to deliver a controlled substance, . . . each of the following elements of the crime must be proved beyond a reasonable doubt:

"(1) That on or about the 21st day of December, 1984, the defendant or her accomplice(s) possessed with intent to deliver a controlled substance . . ."

[6]Jury unanimity is required, however, in the situation where the proof consists of several different acts, any one of which could constitute the offense charged, and the State has not made an election as to which act it will prove. *E.g., State v. Petrich,* 101 Wn.2d 566, 683 P.2d 173 (1984).

possession of a controlled substance under the theory of constructive possession, but that there was insufficient evidence to convict Ramirez under the theory of accomplice liability. Thus, we reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

GROSSE, J., concurs.

SWANSON, J. (dissenting)—I cannot agree with the majority's conclusion that there is insufficient evidence to support the jury's guilty verdict based on accomplice liability.

The majority's own recital of the facts places Ramirez in the very center of an active heroin distribution operation, involving $30,000 of heroin sold each week and masterminded by her live–in–companion, Garcia. The majority further acknowledges that there is enough evidence to support a finding that she was in constructive possession of heroin, yet draws the astonishing conclusion that "there is not even an inference of Ramirez's liability as an accomplice."

The majority seeks to characterize Ramirez as the cook and cleaning lady whose efforts were devoted exclusively to domestic tasks, "totally distinct from and incidental to" the possession of heroin with intent to deliver criminal activity. Such a narrow description of Ramirez's role in the enterprise is misleading and incorrect.

Preliminary to any review of the evidence regarding Ramirez's involvement, it must be borne in mind that the evidence and all reasonable inferences to be drawn therefrom are to be interpreted in a light most favorable to the State. In addition, our Supreme Court has held that an aider and abettor's culpability may be established by circumstantial evidence. *State v. Gladstone,* 78 Wn.2d 306, 317, 474 P.2d 274, 42 A.L.R.3d 1061 (1970).

This criminal enterprise began following Ramirez's arrival in Seattle with Garcia. The Cloverdale house in West Seattle was established as the base of operations, with

Garcia generally in charge. He arranged for resupplying the heroin and for delivery. Amezola and Peraza, the two young Hispanics from Southern California, took orders along with Garcia and made deliveries. While Ramirez primarily took care of the house, prepared the meals, cleaned the kitchen and other rooms, other facts overwhelmingly show her complicity in the criminal activity spanning many weeks and persuade me that she was an important member of the heroin distribution team.

All of the residents of the house including Ramirez traveled to Seattle to occupy the Cloverdale house and immediately began a highly organized heroin distribution operation. Ramirez was not a stranger to the principal drug dealer, Garcia. She had shared an apartment with him in Long Beach, California. She shared the house and a bedroom with Garcia in the Cloverdale house in Seattle. As to her guilty knowledge, none of the residents of the house held a job or had a source of income apart from profits obtained from selling heroin. Nonetheless, Garcia and Ramirez apparently managed somehow to maintain residences in two states and, on at least one occasion, travel together briefly to the apartment in California. From these facts and the reasonable inferences therefrom, a fact finder could conclude that the only purpose of occupying the house was to use it as a drug distribution center.

There was substantial evidence that Ramirez knew exactly what was going on. As correctly recited in the majority opinion, Garcia, Peraza, and Amezola typically would cut and package heroin in the kitchen while Ramirez was preparing dinner or just working in the kitchen. There was no attempt to conceal this activity from her; she was treated at all times as a trusted participant.

There is also testimony in the record that 10 to 20 calls were received each day requesting heroin deliveries. While Ramirez did not answer the phone, she was frequently present when the calls were received and when Garcia would direct Amezola and Peraza to deliver the heroin. On one occasion she was seated next to Garcia when an order

was received. He then told Amezola and Peraza how much was ordered and where to deliver it.

While she usually only left the house to shop for groceries, Ramirez accompanied Garcia on a trip to California allegedly to check on her apartment. Garcia and Ramirez returned to Seattle with heroin.

When the police arrested Ramirez and the other occupants, substantial quantities of heroin, $15,000 in United States currency, weapons, ammunition, a cocaine kit, scales, and other items were seized. I agree with the majority opinion that the jury could properly find that Ramirez had constructive possession of heroin.

The profits from the heroin selling scheme were divided among Amezola, Peraza, and Garcia. During the entire operation, from the receipt of the raw or bulk heroin from sources in California delivered by couriers, to the cutting, packaging, taking orders, and delivering of heroin, Ramirez was literally and figuratively in the middle of the enterprise.

Despite this evidence of direct involvement and the reasonable inferences therefrom, the majority concludes because she never actually handled heroin, assisted in the packaging, or went on deliveries, that Ramirez's activity amounted to nothing more than physical presence and assent and was insufficient to establish accomplice liability. Our Supreme Court in *In re Wilson,* 91 Wn.2d 487, 588 P.2d 1161 (1979) made it clear that a person aids and abets if he or she in some way associates himself or herself with the undertaking or participates in it as in something he or she desires to bring about by his or her actions to make it succeed. *Wilson,* at 491.

Ramirez associated herself with the entire undertaking even though she may have stopped short of putting the heroin in baggies and physically delivering it to a buyer. Her contribution to the enterprise, keeping house, preparing the meals, and shopping for groceries, enabled the active drug dealers, Garcia, Amezola, and Peraza, to devote full time to the packaging and selling activity and thus

helped to bring about a smooth running and efficient operation. It is significant that Ramirez's role did not involve an isolated and otherwise unexplained presence at a single, discrete event, but rather a continuing and close association with the drug dealers over a protracted period of time.

Viewed individually or out of context the evidentiary circumstances do not support a finding of accomplice liability. Viewed in context, however, the direct evidence, the circumstantial evidence, and the resulting inferences all point to Ramirez as one "ready to assist" in the commission of the crime of possessing heroin with intent to deliver and would permit a fact finder to attribute to her active participation and the kind of continued support to the enterprise that constitutes affirmative action not mere approval or passive acquiescence.

Whether or not Ramirez's implicit ostrich defense was credible is not for this court to determine; there was, however, sufficient evidence to present the question of accomplice liability to the jury.

I would affirm the conviction.