IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32300-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| NORMAN RUSSELL ADAMS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Norman Adams appeals his convictions for second degree assault, unlawful imprisonment, and second degree unlawful possession of a firearm. He contends the trial court committed instructional error and that insufficient evidence supports his conviction of unlawful possession of a firearm. He also contends that trial counsel was ineffective for failing to (1) call witnesses, (2) object to jury instructions, and (3) convey a plea offer. Finding no error, we affirm.

## FACTS

Norman Adams and Larane Wuilliez were boyfriend and girl friend. Ms. Wuilliez leased a home on Sunset Lane, Bremerton, and Mr. Adams resided in the home. By November 2011, the two had dated for two and one-half years. According to Ms. Wuilliez, Mr. Adams assaulted her every couple of weeks.

An altercation occurred between the two at Ms. Wuilliez's home on November 12, 2011. Mr. Adams and Ms. Wuilliez disagree on what occurred. According to Ms. Wuilliez, on that day, she pressed Mr. Adams for rent money but Mr. Adams would not give her any money. The couple got into an argument. Mr. Adams punched Ms. Wuilliez in the face, knocked her to the ground, pinned his knees on her neck, and strangled her. Ms. Wuilliez began to pass out. Mr. Adams then dragged a fully clothed Ms. Wuilliez into the shower, and made her sit in the shower with him so he could keep an eye on her. Ms. Wuilliez told Mr. Adams that she wanted to leave but he would not let her. Ms. Wuilliez believed Mr. Adams would beat her if she tried to leave. After Mr. Adams finished showering, Ms. Wuilliez lay on the bed, and Mr. Adams gave her ice for her neck.

According to Ms. Wuilliez, Mr. Adams left the house, telling her that he was going to collect debts to get money to pay the rent. Ms. Wuilliez removed her wet clothes and took a sleeping pill. She was afraid to call police. She did not want law enforcement to arrest Mr. Adams, nor did she wish to testify against him at a trial.

According to Mr. Adams, Ms. Wuilliez and he argued about rent money. Ms. Wuilliez called him names and "push[ed] his buttons." Clerk's Papers (CP) at 8. Mr. Adams slapped and pushed Ms. Wuilliez when she refused to leave the shower.

2

Christina Boyd is a friend and co-worker of Ms. Wuilliez, and Clayton Young is the fiancé of Ms. Boyd. On November 12, 2011, Ms. Boyd received text messages from Ms. Wuilliez. The text messages concerned Ms. Boyd, so she went to Ms. Wuilliez's residence to check on her friend. Ms. Boyd banged on the doors and called Ms. Wuilliez's telephone, but got no response. Ms. Boyd called law enforcement and asked for a welfare check on Ms. Wuilliez.

On November 12, 2011, Kitsap County Sheriff's Officer Sonya Matthews responded to the call and went to Ms. Wuilliez's home. Officer Matthews knocked on several of the house's doors, but got no response.

Ms. Boyd sent text messages to Ms. Wuilliez and when Ms. Boyd finally received a response, she and Mr. Young returned to Ms. Wuilliez's residence and met with her. Mr. Young and Ms. Boyd saw Ms. Wuilliez's bruised face and noticed she was in pain. Mr. Young observed two black eyes and marks on Ms. Wuilliez's arms. Ms. Boyd thought Ms. Wuilliez's nose might be broken. Mr. Young called police.

Officer Matthews returned to Ms. Wuilliez's house with another deputy sheriff. The deputies approached Ms. Wuilliez inside her residence and observed blood on her face, black and swollen eyes, a swollen nose, and bruising on her nose, chin, mouth, and neck. They also observed a bruise on Ms. Wuilliez's shoulder one-half the size of a fist.

3

Ms. Wuilliez hesitated to speak to the two county sheriff deputies. She told them that the red marks were from being assaulted, and related her account of the assault by Mr. Adams. She explained that she remained frightened.

After the officers left, Mr. Young asked Ms. Wuilliez if there were weapons that could be used to hurt those who assisted her. Mr. Young eventually asked Ms. Wuilliez if he could look in a locked shed in the backyard. Ms. Wuilliez handed Mr. Young three or four key rings, each with approximately 30 keys per ring. Mr. Young tried a majority of the keys, but was unable to open the lock. He then asked Ms. Wuilliez if he could cut the lock, and, after Ms. Wuilliez agreed, he removed the lock and entered the shed. Among tools and car parts in the shed, Mr. Young found a loaded firearm wrapped in cloth.

Later that day, Ms. Boyd called law enforcement and stated they discovered a revolver and ammunition. Deputies responded and confiscated the firearm. Testing showed the gun functioned. Its serial number had been removed.

At 4:00 a.m. the following morning, Ms. Wuilliez called 911 and reported that she saw Mr. Adams at her house. Deputies arrived at the home within minutes and saw Mr. Adams in a car outside the residence. Deputies arrested and advised Mr. Adams of his constitutional rights. Mr. Adams waived his rights and spoke with police.

4

Mr. Adams related his version of the altercation to sheriff deputies. Mr. Adams said that he knew Ms. Wuilliez would have injuries on her face and suggested that Ms. Wuilliez fell against a washing machine. When asked if he forced Ms. Wuilliez into the shower, Mr. Adams answered: "'I don't know.'" Report of Proceedings (RP) at 138. Eventually, Mr. Adams requested an attorney and police transported him to jail.

On December 21, 2011, the State charged Mr. Adams with one count of assault in the second degree and one count of unlawful imprisonment, both with domestic violence aggravating factors. Clayton Longacre represented Mr. Adams at trial. Different counsel initially represented Mr. Adams. Before Mr. Longacre's appearance, the State made a plea offer to Mr. Adams. The offer included a standard sentence range recommendation of 63 to 84 months.

Mr. Longacre and Mr. Adams disagree as to plea negotiations that occurred once Mr. Longacre appeared. According to Mr. Longacre, once he represented Mr. Adams, he occasionally spoke with the prosecutor about resolving the case with a misdemeanor charge. The prosecutor would not agree to this resolution and refused to reduce the amount of prison time recommended in the initial plea offer, which was 8 to 10 years.

According to Mr. Longacre, several days before trial, the prosecutor offered to amend the charge to assault in the third degree, and offered to recommend an exceptional

5

sentence downward. At the time of his testimony at a posttrial hearing, Mr. Longacre could not remember the number of months that the prosecutor offered to recommend, but he believed the offer was approximately 30 months. Mr. Longacre discussed the matter with the prosecutor during a pretrial hearing and relayed the exact offer to Mr. Adams in the courtroom.

Kelly Montgomery, the prosecutor, testified about settlement negotiations. She stated that she never extended a formal plea offer to Mr. Adams through Mr. Longacre, but that she and Mr. Longacre engaged in a series of e-mail communications discussing potential modifications to the charges, culminating in an offer from the State to reduce charges to assault in the third degree with an exceptional sentence downward. Ms. Montgomery and Mr. Longacre had numerous discussions regarding the potential length of Mr. Adams's sentence should he accept the offer. According to Ms. Montgomery, these conversations culminated in her offering, during a March 20 pretrial hearing, a 24-month sentence. Immediately after she made this offer, she saw Mr. Longacre speak with Mr. Adams in the jury box. She did not hear the conversation, but, according to Ms. Montgomery, Mr. Longacre returned to Ms. Montgomery and said, "'[g]ross misdemeanor or trial,'" which Ms. Montgomery understood as Mr. Longacre having communicated her offer to Mr. Adams, but Mr. Adams rejecting the offer. Report of

Proceedings (RP) (Dec. 17, 2012) at 39.

On April 17, 2012, the State amended the charges to one count of second degree assault with a domestic violence aggravating factor, two counts of unlawful imprisonment with a domestic violence aggravating factor, and one count of unlawful possession of a firearm in the second degree. On April 17, the trial court also addressed the State's request to present evidence of prior assaults upon Ms. Wuilliez by Mr. Adams, to establish Ms. Wuilliez's credibility and her reluctance to report Mr. Adams. The trial court ruled that evidence relating to three prior incidents could be introduced, but evidence relating to three other altercations could not be introduced. On April 18, Mr. Adams stipulated that his statements to police were admissible.

On the day that jury selection began, Ms. Wuilliez appeared in the courtroom. Mr. Adams had not expected Ms. Wuilliez to testify against him. Consequently, according to Mr. Longacre, he and the prosecutor discussed resolution in the hallway outside the courtroom, and Mr. Longacre asked the prosecutor whether the State's most recent offer remained open. The prosecutor advised that a plea offer with the same recommendation for prison time remained available, but that the charges would be "tweaked" since a jury had already been called. RP (Dec. 17, 2012) at 15. Mr. Longacre relayed this offer to Mr. Adams. Mr. Longacre testified that, after discussing the offer with Mr. Adams, he

returned to the prosecutor to clarify the specifics regarding the charges that would comprise the plea offer. After conferring with the prosecutor, Mr. Longacre revisited Mr. Adams in the courtroom and discussed the offer further. According to Mr. Longacre, Mr. Adams vacillated between accepting and declining the offer, but ultimately decided to proceed to trial because he thought Ms. Wuilliez "would not slam him in the trial." RP (Dec. 17, 2012) at 16.

According to the prosecutor, she and Mr. Longacre further discussed resolution at the beginning of trial. Mr. Longacre indicated that Mr. Adams still wanted reduction of charges to a gross misdemeanor. The prosecutor replied that, because trial had started, Mr. Adams could still get the exceptional low offer of 24 months and the State would dismiss one of the unlawful imprisonment charges, but that Mr. Adams must plead to assault in the second degree. The prosecutor saw Mr. Longacre immediately enter the courtroom and speak to Mr. Adams for 10 minutes, but that Mr. Longacre exited the courtroom to again ask to reduce the charges to a misdemeanor. The prosecutor refused. Mr. Longacre returned to the courtroom one more time and spoke with Mr. Adams before returning to the hallway and telling the prosecutor that Mr. Adams wanted a gross misdemeanor.

According to Mr. Adams, he suffered from methamphetamine withdrawal during the time of plea negotiations. He claimed he was "dope sick" while awaiting trial in jail, and that this "[s]ometimes" affected his ability to perceive. RP (Dec. 17, 2012) at 70.

Trial commenced on April 18, 2012. The State introduced photographs of Ms. Wuilliez's injuries. Ms. Wuilliez testified about the events just described, stating that she and Mr. Adams got in a fight over rent money. He pushed her down, hit her in the face, punched her in the nose, choked her until she saw spots, and made her stay in the shower with him until he finished showering. Ms. Wuilliez described several previous assaults by Mr. Adams. The officers who responded to Ms. Wuilliez's home on November 12, 2011, testified and described Ms. Wuilliez's injuries.

Ms. Boyd testified that a gun was found in a backyard shed at Ms. Wuilliez's house. Ms. Boyd also testified about prior times when she observed bruising on Ms. Wuilliez's body. Mr. Young testified that he found the gun in a locked shed.

Ms. Wuilliez explained that Mr. Adams stored property in the shed and that the shed was usually locked. She specifically testified that the shed contained car-related items and that only Mr. Adams stored his "stuff" in the shed. RP (Apr. 19, 2012) at 319. Ms. Wuilliez also testified that she occasionally saw Mr. Adams with a firearm. She described the firearm as a handgun, but could not identify the specific type of handgun.

9

Ms. Wuilliez further testified that the key to the shed was kept in the kitchen and that her brother and her brother's significant other had stayed in the home. Ms. Wuilliez denied that her brother stored any property in the shed. Mr. Adams testified that he had no idea the gun was in the shed, had no guns in the house, and did not own a gun.

During jury deliberations, the jury requested clarification of the constructive possession instruction (jury instruction 23). The note read:

> We request further clarification on #23 as it pertains to 1) "dominion and control" and the 2) "need not be exclusive" to finding of constructive possession. Request definition & clarification.

CP at 115.

Without objection from defense counsel, the court did not offer any clarification of the instruction.

The jury found Mr. Adams guilty of second degree assault, one count of unlawful imprisonment, and second degree unlawful possession of a firearm. The jury found that Mr. Adams assaulted Ms. Wuilliez by strangulation and with the intent to commit a felony. The jury also found that the assault and unlawful imprisonment were crimes of domestic violence.

After trial, the prosecutor spoke with Mr. Adams in the jail. Mr. Adams talked about going to jail for a long time. The prosecutor asked Mr. Adams why he rejected the

10

deal for 24 months, and Mr. Adams, in response, looked shocked, dazed, and upset. Mr. Adams told the prosecutor that he was not aware of any deal.

On May 4, 2012, after the jury verdict but before sentencing, appellate counsel substituted for Mr. Adams's trial counsel, Mr. Longacre. On May 11, Mr. Adams, through appellate counsel, filed a motion for arrest of judgment, new trial, and relief from judgment. On May 18, Mr. Adams filed a motion to continue sentencing and the posttrial motions date. On June 28, Mr. Adams filed a motion for relief from judgment and for a new trial under CrR 7.5 and CrR 7.8. His arguments mirrored his contentions on appeal: (1) jury instruction 20 misstated the elements of the crime of unlawful possession of a firearm, (2) trial counsel was ineffective by failing to propose a jury instruction defining "dominion and control" and by failing to object to given instructions, (3) trial counsel was ineffective by failing to call some witnesses, and (4) insufficient evidence supported the conviction for unlawful possession of a firearm. In support of the motion for a new trial, Mr. Adams also argued that trial counsel was ineffective for failing to forward pretrial offers from the State to him.

As part of the posttrial motions, Mr. Adams filed declarations from friends and family. Shane Adams, Mr. Adams's brother signed a declaration regarding a conversation with Mr. Longacre at a restaurant after a pretrial hearing. Mr. Adams

declared that Mr. Longacre stated there were no plea offers and the judge would not accept a plea. Shane's father, Mr. Adams Sr., was present during that conversation.

Mr. Adams, Sr., signed a declaration, in which he described the conversation with Mr. Longacre at the restaurant. Mr. Adams, Sr., added that he had another conversation later with Mr. Longacre at the courthouse, during which Mr. Longacre stated, "'they won't go with a deal, and the judge will not allow it.'" CP at 252.

Mr. Adams's wife, Cynthia L. Adams, also signed a declaration. She explained that she has not lived with Mr. Adams for 11 years. According to Ms. Adams, Mr. Adams "is a very gentle person," who has "never been violent with" her despite actions that would have provoked others to violence. CP at 210. She claimed Mr. Adams has never had a gun. Ms. Adams stated that she tried to contact Mr. Longacre many times and spoke with him once. According to Ms. Adams, Mr. Longacre did not want information on witnesses.

Brock D. Chambers submitted a declaration stating that he works on vehicles with Mr. Adams. He stated that "Norm is an excellent mechanic & had the tools & equipment to work on anything so Norm's was the place to go to work on cars." CP at 213. On November 11, 2011, Mr. Chambers worked with Mr. Adams on cars at Mr. Adams's property. According to Mr. Chambers, Ms. Wuilliez "was hounding Norm about

12

something." CP at 214. Ms. Wuilliez "was very jealous & got angry if & when Norm left & would yell & argue when Norm got home calling Norm over & over while he was gone." CP at 214. "Norm was never violent but Larane was very violent, Larane was the aggressor whenever I was there. I never saw Larane beat up or even look like she had been beat up or abused in any way & I was there a lot." CP at 214. Mr. Chambers also stated that he had never seen or heard of Mr. Adams having a gun.

Donna Marie Jones declared she saw Mr. Adams and Ms. Wuilliez two to three times per week for two years. Ms. Jones never saw Mr. Adams abuse Ms. Wuilliez. According to Ms. Jones, Mr. Adams "seemed" more afraid of Ms. Wuilliez than vice versa. CP at 217. Ms. Jones speculated that Ms. Wuilliez "probably beat on Norm." CP at 218. According to Ms. Jones, Mr. Adams lacked an interest in guns and never had a gun in her presence. He once said he could not "'be around guns.'" CP at 218 (emphasis omitted). Ms. Jones stated that she called Mr. Longacre's office twice, but that he never returned her calls.

Patrick Lacy stated that he worked with Mr. Adams on cars at Mr. Adams's home "almost every day." CP at 221. He stated, "Norman kept his tools & parts for cars we were working on in the shed behind the house but the shed was never locked when I was there because we were using equipment & tools from the shed." CP at 221. Mr. Lacy

13

never saw Ms. Wuilliez appear abused. Mr. Lacy claimed he never saw Mr. Adams with a gun or speak of a gun.

Mr. Adams went to Scott McLeod's home the day before Mr. Adams's arrest. According to Mr. McLeod, Mr. Adams was "upset & told me he (Norm) & Larane had gotten into an argument while Norm was in the shower. Norm told me he pushed Larane away but Larane kept coming at him until he finally got out of the house. Norm didn't say too much about it because he was very upset." CP at 225. Mr. McLeod never saw Ms. Wuilliez abused and characterized her as demanding and controlling. Mr. McLeod never saw Mr. Adams with a gun. Mr. McLeod stated that he spoke with Mr. Longacre at the courthouse after a hearing and attempted to tell him "things" he considered "important." CP at 225.

Angela Faye O'Donnal stated that she had known Mr. Adams for about 20 years and "Larane for a long time too." CP at 228. Ms. O'Donnal remembered "about 10 years ago when Larane was with Brad Baker & lived on Anderson Hill in Port Orchard, Larane would throw things at Brad & beat on Brad when Larane was angry with Brad just the way Larane is. Larane yells, cusses, calls names, hits, & throws things when Larane does not get her own way." CP at 228. Ms. O'Donnal never saw Ms. Wuilliez with bruises.

Ervin Schmith lived with Ms. Wuilliez about eight years earlier. According to Mr. Schmith, "It all started out good but as time went on Larane became progressively more violent & ended with Larane having to leave because of the violence. . . . Larane is a very jealous, possessive person & when I had to leave or did not do what Larane wanted the screaming violent attacks from Larane started. . . . I remember 1 time when Larane & I were at my friend Raymond Houghton's house & as we were leaving Larane out of the blue sucker punched me giving me a black eye." CP at 231-32.

Marlin Willard characterized Ms. Wuilliez as an "'alley cat fighter.'" CP at 234. Mr. Willard stated that he has known her "for a long time" and that she "has always been a violent person." CP at 234. He recalled that Ms. Wuilliez would "go after" her then boyfriend when she did not get her way. CP at 234. He stated the boyfriend "got rid of Larane because of her violence. . . . Larane just knows how to push buttons & is just an 'alley cat fighter.'" CP at 234-35. He also stated, "I never saw Norm ever fight back, Norm's just not that kind of guy just not a violent guy at all." CP at 235. Mr. Willard knew the keys to the shed hung on a cabinet in the kitchen near the door. According to Mr. Willard, he "got a message that Clayton Longacre was Norm's attorney & was asked if I would give Mr. Longacre my information but I never heard from Mr. Longacre." CP at 236.

15

On December 17, 2012, the trial court conducted a hearing on the motion for a new trial based upon the alleged failure of defense counsel to convey the State's offers to Mr. Adams. Mr. Longacre stated that he had never rejected a plea offer, never told anyone there was no plea offer, and never said the judge would not accept any purported offer. Mr. Longacre added that, on the day that jury voir dire began, he communicated the 30-month plea offer to Mr. Adams, but Mr. Adams rejected the offer. Mr. Longacre confirmed that he had previously been suspended from the bar for failing to communicate plea offers to his clients.

Mr. Adams, Sr., also testified at the hearing. He stated that he spoke with Mr. Longacre about the potential for settling his son's case with a plea bargain, but that Mr. Longacre told him that there had been no plea offer. He also testified that he spoke with his son in court about any possible plea offer, and his son told him that he had not been informed of any plea offer.

Mr. Adams testified that Mr. Longacre only discussed continuances, not plea offers, during their discussions in the courthouse. Mr. Adams spoke with Mr. Longacre in the jail about plea negotiations, but, according to Mr. Adams, Mr. Longacre always claimed the State was firm on the 84-month offer. Mr. Adams averred that, on the first day of trial, Mr. Longacre repeated that the State was firm on its original offer and was

16

not offering to reduce charges to a misdemeanor. Mr. Adams testified that he never insisted on pleading only to a misdemeanor, but Mr. Longacre repeatedly mentioned a misdemeanor. Mr. Adams also testified that Mr. Longacre never informed him of an offer for a 24-month sentence from the State, and that he would have accepted such an offer. Mr. Adams declared that he first heard of a 24-month offer when he spoke with the prosecutor in the jail. Mr. Adams insisted that Mr. Longacre never communicated to him an offer for 24, 30, or even 36 months.

Mr. Adams stated he had hoped for an offer of a gross misdemeanor with credit for time served. Mr. Adams also acknowledged that he did not remember everything he had discussed with trial counsel and that he had been "dope sick" during the plea negotiations and the December 17 hearing.

The trial court denied Mr. Adams's motion for a new trial, finding that Mr. Longacre had communicated the plea offers to Mr. Adams.

On January 8, 2013, a different judge at another hearing denied Mr. Adams's other motions for a new trial and for relief from judgment. The trial court sentenced Mr. Adams to a low end standard range sentence of 63 months.

17

ANALYSIS

*Instructional Error*

Jury instruction 20 states:

> A person commits the crime of unlawful possession of a firearm in the second degree when he or she knowingly owns a firearm or has a firearm in his or her possession or control and he or she has previously been convicted of a felony.

CP at 104.

RCW 9.41.040 defines unlawful possession of a firearm as:

> (2)(a) A person . . . is guilty of the crime of unlawful possession of a firearm in the second degree, if . . . the person owns, has in his or her possession, or has in his or her control any firearm:
> (i) [a]fter having previously been convicted . . . of any felony.

The statute does not contain the word "knowingly." Nevertheless, "knowing possession" is an essential element of the crime of unlawful possession of a firearm. *State v. Hartzell*, 156 Wn. App. 918, 944, 237 P.3d 928 (2010) (citing *State v. Anderson*, 141 Wn.2d 357, 366, 5 P.3d 1247 (2000)). Mr. Adams contends that jury instruction 20 misstated the law and misled the jury because the word "knowingly" did not appear immediately in front of the phrase "possessing or owning a firearm." We review alleged errors of law in jury instructions de novo. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). If a jury instruction correctly states the law, the trial court's decision to give

18

the instruction will not be disturbed absent an abuse of discretion. *State v. Aguirre*, 168 Wn.2d 350, 364, 229 P.3d 669 (2010). We also review a trial court's refusal to give an instruction for an abuse of discretion. *State v. Buzzell*, 148 Wn. App. 592, 602, 200 P.3d 287 (2009).

Jury instructions should be read as a whole. *State v. Krup*, 36 Wn. App. 454, 463, 676 P.2d 507 (1984); *State v. Despenza*, 38 Wn. App. 645, 651, 689 P.2d 87 (1984). An ambiguous instruction may be cured by another jury instruction. *Krup*, 36 Wn. App. at 463. A criminal defendant is entitled to jury instructions that accurately state the law, permit him to argue his case theory, and are supported by the evidence. *State v. Staley*, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). "To satisfy the constitutional demands of a fair trial, the jury instructions, when read as a whole, must correctly tell the jury of the applicable law, not be misleading, and permit the defendant to present his theory of the case." *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009) (citing *State v. Mills*, 154 Wn.2d 1, 7, 109 P.3d 415 (2005)).

Mr. Adams did not object to the jury instruction at trial. Under RAP 2.5(a), an appellate court may decline to hear assignments of error not raised before the trial court. One exception to this rule is a party's assertion of "manifest error affecting a constitutional right." RAP 2.5(a)(3). Under this exception, an appellant must

demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension. *O'Hara*, 167 Wn.2d at 98. An objection to a jury instruction cannot be raised for the first time on appeal unless the instructional error is of constitutional magnitude. *State v. Fowler*, 114 Wn.2d 59, 69, 785 P.2d 808 (1990).

We cannot determine if the trial court committed manifest error without first reviewing the substance of the claimed error. Thus, our Washington Supreme Court agreed to hear an appellant's argument for the first time on appeal for the need for a unanimity instruction. *State v. Bobenhouse*, 166 Wn.2d 881, 891-92, 214 P.3d 907 (2009). We, therefore, address Mr. Adams's assignments of error.

Jury instruction 20 is a pattern instruction. *See* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 133.02.01, at 571 (3d ed. 2008). However, Mr. Adams criticizes the grammar in the instruction, arguing that it can be read to require that a defendant knowingly owned a firearm, but that a person can commit the crime by possessing a firearm without knowingly possessing the firearm. In other words, the jury could erroneously extend the adverb "knowingly" only to owning, and not possessing.

Jury instruction 21 resolves any ambiguity. Mr. Adams claims that jury instruction 20 conflicts with instruction 21. However, the contrary is true. Assuming an ambiguity

20

in jury instruction 20, instruction 21, the "to convict" instruction, cures the ambiguity, clearly stating that to convict the defendant of the crime, the State had to prove that he "*knowingly* owned a firearm or *knowingly* had a firearm in his possession or control." CP at 105 (emphasis added). Thus, any ambiguity is remedied by the insertion of "knowingly" immediately before "had a firearm in his possession or control." We conclude that the jury instructions at issue allowed Mr. Adams to argue that the State needed to prove that he "knowingly" possessed or controlled a firearm.

### *Jury Instruction 23—Constructive Possession*

Mr. Adams also claims error in jury instruction 23. Instruction 23 was based on WPIC 133.52. He did not object to the instruction at trial, so he must show a manifest error of constitutional dimension. He does not show any error.

Jury instruction 23 provided:

> Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is *dominion and control* over the item.
> Proximity alone without proof of *dominion and control* is insufficient to establish constructive possession. *Dominion and control* need not be exclusive to support a finding of constructive possession.
> In deciding whether the defendant had *dominion and control* over an item, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the ability to take actual possession of the item, whether the defendant had the

21

capacity to exclude others from possession of the item, and whether the defendant had *dominion and control* over the premises where the item was located. No single one of these factors necessarily controls your decision.

CP at 107 (emphasis added).

Mr. Adams complains that the phrase "dominion and control" is "not an expression 'of ordinary understanding'" for lay people. Br. of Appellant at 14. He argues that his trial counsel should have proposed, and the court should have given, a jury instruction defining the words. Mr. Adams points to the jury question, which asked for "further clarification on #23 as it pertains to 1) 'dominion and control.'" CP at 115. He contends the court should have instructed the jury that "dominion and control" requires ownership of the item as well as a finding that the person "be aware that the item exists." Br. of Appellant at 14.

"[W]hether the words used in an instruction require further definition is a matter of judgment to be exercised by the trial court." *State v. O'Donnell*, 142 Wn. App. 314, 325, 174 P.3d 1205 (2007). *State v. Amezola* controls the issue and forecloses Mr. Adams's argument. *State v. Amezola*, 49 Wn. App. 78, 741 P.2d 1024 (1987), *overruled on other grounds by State v. McDonald*, 138 Wn.2d 680, 981 P.2d 443 (1999). In *Amezola*, the defendant was convicted of possession a controlled substance. On appeal, the defendant argued the court's instructions on dominion and control and constructive possession did

22

not sufficiently explain the meaning of the phrase "dominion and control." *Amezola*, 49

Wn. App. at 87. The court answered:

> While the trial court in a criminal case is required to define technical words
> and expressions, it need not define words and expressions which are of
> common understanding. Whether words used in an instruction require
> definition is necessarily a matter of judgment to be exercised by the trial
> court. . . . Thus far our courts have not treated "dominion and control" as a
> technical phrase or term of art, and we decline the invitation to do so.

*Amezola*, 49 Wn. App. at 87-88 (internal citations omitted).

The committee on pattern instructions has explained that Washington' s case law

has not developed a direct and consistent definition of "dominion and control" that can be

incorporated into a jury instruction. *See* 11 WPIC 50.03, cmt. Under *Amezola*, the court

did not err by refusing to provide the jury additional definitions for "dominion and

control."

### *Ineffective Assistance of Counsel—Jury Instructions*

Mr. Adams claims his counsel should have objected to jury instructions 20 and 23

and should have proposed one or more instructions to define "dominion and control."

Failure to request an instruction or object to an instruction can constitute ineffective

assistance of counsel. *In re Pers. Restraint of Hubert*, 138 Wn. App. 924, 929, 158 P.3d

1282 (2007). To prevail on a claim of ineffective assistance based on counsel's failure to

propose a jury instruction, Mr. Adams must show that (1) defense counsel's failure to

23

request the instruction was not a legitimate tactical decision and (2) had counsel requested the instruction, the trial court likely would have given it. *State v. Powell*, 150 Wn. App. 139, 154-55, 206 P.3d 703 (2009).

We give great deference to trial counsel's performance and begin our analysis with the strong presumption that counsel was effective. Mr. Adams must overcome this presumption and show that his counsel's failure to request the instruction could not have been a legitimate trial tactic to support his claim of ineffective assistance. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995); *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To prevail on an ineffective assistance of counsel claim, the defendant must show that, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *McFarland*, 127 Wn.2d at 334-35. Counsel does not fall below the standard if he relies on pattern jury instructions. *State v. Studd*, 137 Wn.2d 533, 550-51, 973 P.2d 1049 (1999).

As discussed in detail above, the jury was properly instructed. Accordingly, Mr. Adams's claim fails. We also note that defense counsel relied on pattern jury instructions. Thus, Mr. Adams cannot show that, if his trial counsel proposed other instructions or objected to the given instructions, the trial court would have given other instructions or

24

withheld jury instructions 20 and 23.

### *Ineffective Assistance of Counsel—Failure to Call Witnesses*

Next, Mr. Adams contends trial counsel was ineffective by failing to call one or more of the eight witnesses who submitted posttrial declarations on his behalf. He argues, "[g]iven that Mr. Adams' defense was that he had nothing to do with the gun and that the shed was accessed by many people, it was not a legitimate trial strategy, nor was it objectively reasonable for Mr. Longacre to fail to call at least one or two of the numerous individuals who contacted him." Br. of Appellant at 21.

Again, to establish ineffective assistance of counsel, a defendant must satisfy a two-part test: (1) his counsel's assistance was objectively unreasonable; and (2) as a result of counsel's deficient assistance, he or she suffered prejudice. *Strickland*, 466 U.S. at 687. To prevail on his claim, a defendant must satisfy both prongs of the ineffective assistance of counsel test. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). If one prong of the test fails, we need not address the remaining prong. *Id.* at 78.

This court presumes counsel was effective. *State v. Gomez Cervantes*, 169 Wn. App. 428, 434, 282 P.3d 98 (2012). To rebut this presumption, a defendant must demonstrate trial counsel's conduct could not be characterized as a legitimate trial strategy or tactic. *Grier*, 171 Wn.2d at 32-33; *Hendrickson*, 129 Wn.2d at 77-78. "The

decision whether to call a witness is ordinarily a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." *State v. Kolesnik*, 146 Wn. App. 790, 812, 192 P.3d 937 (2008) (citing *State v. Maurice*, 79 Wn. App. 544, 552, 903 P.2d 514 (1995)).

To satisfy the prejudice prong, the defendant must establish that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To make a determination of prejudice, this court considers the totality of the evidence before the jury. *Strickland*, 466 U.S. at 695.

Mr. Adams fails to show that trial counsel acted unreasonably by failing to call potential defense witnesses. Mr. Adams claims that six witnesses contacted trial counsel. The record, however, shows that only three witnesses contacted him. Mr. Chambers, Mr. Lacy, and Mr. Willard did not indicate that they spoke with trial counsel. Accordingly, Mr. Adams cannot show any deficient performance with respect to these witnesses since there is no evidence counsel was aware of their existence.

As noted above, Ms. Adams, Ms. Jones, and Mr. McLeod claimed to have either spoken with trial counsel or to have left a message for him. Nevertheless, Mr. Adams fails to demonstrate that these witnesses could have provided admissible testimony that

would have helped him. Mr. Adams emphasizes the need for witnesses to help show the gun found in the shed was not owned, possessed, or controlled by him. However, Mr. McLeod stated that he knew Mr. Adams kept items in the shed; a fact that would have bolstered the State's case. Additionally, no witness claimed any knowledge that anyone other than Mr. Adams stored personal property in the shed.

Mr. Adams also asserts that Mr. McLeod, Mr. Lacy, and Mr. Willard told Mr. Longacre that the key to the shed hung on a cabinet in the kitchen and that the shed was often left unlocked. However, this assertion misconstrues the record. Mr. Lacy and Mr. Willard had no contact with Mr. Longacre, and although Mr. McLeod testified he spoke to trial counsel, he stated that Mr. Adams stored property in the shed—information that could have damaged Mr. Adams's case. Moreover, any testimony about the key hanging in the kitchen would be cumulative as the evidence at trial showed that the key to the shed was kept in the kitchen.

All witnesses declared that they never saw Mr. Adams with a gun. However, Mr. Adams fails to show the admissibility of this testimony. Under ER 404(a), evidence of a person's trait or character is generally inadmissible. The fact that these witnesses claimed to have never seen Mr. Adams with a gun is weak evidence that Mr. Adams did not own or possess a gun.

Finally, it is entirely possible that defense counsel had concerns about the credibility of the potential witnesses. This is why witness selection is peculiarly a matter of trial tactics and discretion with trial counsel. *Kolesnik*, 146 Wn. App. at 812 (citing *Maurice*, 79 Wn. App. at 552). Mr. Longacre may have decided after speaking to some of the witnesses that their testimony was less than credible. Their eagerness to criticize Ms. Wuilliez particularly suggests a lack of credibility. Mr. Longacre spoke with some of the witnesses and made the decision not to call those witnesses to testify at trial. This is not a basis for a claim of ineffective assistance of counsel. Mr. Adams has failed to overcome the strong presumption that his counsel provided effective representation.

### *Ineffective Assistance of Counsel—Conveyance of Offers*

Finally, Mr. Adams argues that trial counsel was ineffective for failing to convey a plea bargain.

A defendant's right to counsel extends to plea negotiations. *Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 1384, 182 L. Ed. 2d 398 (2012); *Missouri v. Frye*, __ U.S. __, 132 S. Ct. 1399, 1405, 182 L. Ed. 2d 379, *cert. denied*, 132 S. Ct. 1789, 182 L. Ed. 2d 615 (2012). Defense counsel must actually and substantially assist a client in deciding whether to plead guilty. *State v. Osborne*, 102 Wn.2d 87, 99, 684 P.2d 683 (1984) (quoting *State v. Cameron*, 30 Wn. App. 229, 232, 633 P.2d 901 (1981)). In the plea

28

bargaining context, counsel must communicate actual offers, discuss tentative plea negotiations, and discuss the strengths and weaknesses of the defendant's case so that the defendant knows what to expect and can make an informed decision on whether to plead guilty. *State v. James*, 48 Wn. App. 353, 362, 739 P.2d 1161 (1987). "We review the issue by asking whether defense counsel communicated the offers to the defendant and whether the defendant has demonstrated a reasonable probability that the defendant would have accepted the offer." *State v. Edwards*, 171 Wn. App. 379, 394, 294 P.3d 708 (2012).

The record undermines Mr. Adams's contention. As detailed above, Mr. Longacre confirmed the communication. Mr. Adams admitted that he could not remember the specifics of his communications with counsel because of his "dope sickness." Additionally, when the prosecutor presented the offer, Mr. Longacre went directly to speak with Mr. Adams and returned to the prosecutor to clarify the offer. Mr. Adams fails to establish ineffective assistance of counsel based on counsel's alleged failure to convey a plea offer.

### *Sufficiency of Evidence—Unlawful Possession of a Firearm*

Mr. Adams seeks dismissal of the charges of unlawful possession of a firearm on the ground the State lacked sufficient evidence at trial to convict him. He contends,

"other than the fact that Mr. Adams stored items in the shed in which the gun was found, there was no evidence linking Mr. Adams to the gun." Br. of Appellant at 25. He argues there is no evidence that Mr. Adams had any knowledge that the firearm was in the shed and that there was no testimony "that anybody ever heard Mr. Adams claim he had a gun." Br. of Appellant at 25.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977).

Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989). But questions of credibility, persuasiveness, and conflicting testimony must be left to the jury. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992). The weight accorded to such evidence is also the sole province of the jury. *State v. Rogers*, 44 Wn. App. 510, 517, 722 P.2d 1349

(1986).

Because Mr. Adams has a prior felony conviction, he is guilty of the crime of unlawful possession of a firearm if he knowingly had in his possession or control any firearm. RCW 9.41.040. Under Washington law, possession may be actual or constructive and constructive possession need not be exclusive. *State v. Jones*, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002); *State v. Turner*, 103 Wn. App. 515, 522, 13 P.3d 234 (2000). A person has constructive possession of an item if he or she has dominion or control over the item such that the item may be reduced to actual possession immediately. *Jones*, 146 Wn.2d at 333. A court reviews the totality of the circumstances to determine whether dominion and control exist. *Partin*, 88 Wn.2d at 906. Finally, when a person has dominion and control over premises, it creates a rebuttable presumption that the person has dominion and control over items on the premises. *State v. Summers*, 107 Wn. App. 373, 384, 28 P.3d 780 (2001).

The evidence in the light most favorable to the State is sufficient to convict Mr. Adams of unlawful possession of a firearm. Mr. Adams lived at the residence on Sunset Lane with Ms. Wuilliez. Ms. Wuilliez testified that Mr. Adams kept items in the shed and that the shed was usually locked. She kept nothing in the shed. No one else, not even Ms. Wuilliez's brother, stored items in the shed. Ms. Wuilliez also testified that she had

31

seen Mr. Adams with a handgun. Mr. Young found the gun with Mr. Adams's tools in the shed.

This was sufficient evidence from which a jury could reasonably infer that Mr. Adams had dominion and control over the firearm. Although Mr. Adams argues that his testimony that he had no knowledge of the firearm was uncontested at trial, we do not make credibility determinations or weigh evidence. Sufficient evidence supports Mr. Adams's conviction for second degree possession of a firearm.

We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, C.J.