IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83803-2-I |
| Respondent, | |
| v. | DIVISION ONE |
| CODY JAMES SHIELDS, | |
| Appellant, | UNPUBLISHED OPINION |
| BRITTANY SHANE DANIELS, | |
| Defendant. | |

BOWMAN, J. — Cody James Shields appeals his jury conviction for second degree manslaughter of his infant son. Shields argues that the trial court erred by instructing the jury that the State can prove criminal negligence by establishing a person acted intentionally, knowingly, or recklessly, that the State's charging document was deficient, and that the court erred by allowing irrelevant testimony. We affirm.

FACTS

On August 25, 2015, Lucian was born to 23-year-old Shields and 21-year-old Brittany Shane Daniels. At the time, Daniels and Shields shared a home with B.D., Daniels' 2-year-old child from a prior relationship. Shields and Daniels used separate bedrooms, and B.D. slept with Daniels in her room while Lucian slept in Shields' room. Shields mostly slept on the couch in the living room. He

had trouble sleeping and often stayed up at night playing video games and watching television. He would then sleep for several hours during the day while Daniels was at work.

Daniels breastfed Lucian for the first month of his life but then had to move to bottle feeding. She and Shields had trouble feeding Lucian, who often cried for long periods and took "upwards of 45 minutes to just finish five to six ounces of formula." Lucian would sometimes go unfed for up to eight hours and had infrequent bowel movements every few days. Shields ignored Lucian's cries and often drowned them out by wearing headphones while playing video games.

In late October 2015, Daniels had two major surgeries, and Shields became Lucian's primary caregiver. Shields grew frustrated with Lucian and often left the child alone in his bedroom with a bottle propped on a rolled-up blanket. Shields knew that the bottle would fall from Lucian's mouth if he moved but left the infant unsupervised with a bottle for hours.[1] In the weeks before Lucian's death, Shields and Daniels exchanged several Facebook messages in which Shields expressed his anger and frustration toward Lucian. Shields described Lucian as "being a dick," that he was "annoying" and needed to "[s]hut the fuck up," and that Shields did not "give a fuck" if he killed Lucian.

On December 7, 2015, Shields stayed up "the entire night" playing video games and watching television. Daniels fed Lucian in the bathroom at about 4:30 a.m. on December 8, unaware that Shields was still awake in the living

---

[1] At least one of the bottles that Shields and Daniels regularly used to feed Lucian had "a gaping hole" in the nipple.

room. She then went back to bed. Shields claims he fed Lucian in his bedroom at about 7:00 a.m. by propping a bottle in front of him with a blanket. Shields then returned to the living room and fell asleep on the couch. Daniels got up at about 9:30 a.m. and quickly left for work because she was "running late." She saw Shields asleep on the couch when she left.

Shields woke up at 2:00 p.m. but did not check on Lucian. Instead, he "found [B.D.] playing in his bedroom" and the two watched cartoons in the living room for another three hours. Shields finally checked on Lucian at 5:00 p.m. and found him dead in his bassinette. Shields started CPR[2] and contacted Daniels by Facebook message instead of calling 911 because he had no working phone. Daniels then called 911 and police responded to the home.

Whatcom County Medical Examiner Dr. Gary Goldfogel conducted Lucian's autopsy on December 9, 2015 and issued an autopsy report on January 20, 2016. He concluded that Lucian died of chronic malnutrition and dehydration. On February 22, 2016, the State charged Shields and Daniels with second degree manslaughter.

In December 2019, Daniels pleaded guilty as charged and started serving her sentence the next month. Before his trial, Shields moved to exclude evidence of Daniels' guilty plea, arguing that it was irrelevant under ER 402. The State argued that it was "permitted to inquire of the co-defendant witness as to the plea agreement she entered into because her decision to plead guilty to the

---

[2] Cardiopulmonary resuscitation.

related charge is relevant to her credibility." The court denied Shields' motion, ruling that "it would be inappropriate for this witness . . . not to be able to talk about her resolving her case." The court also ruled Daniels should not use "the word 'guilty' " during her testimony, but she could say she "resolved her case."

Shields' jury trial began in June 2021. The State admitted several of the Facebook messages between Shields and Daniels to show that Shields neglected Lucian's care. The State also called Dr. Goldfogel, who testified about his January 2016 autopsy report.

Dr. Goldfogel testified that he has conducted "thousands" of autopsies in his 33 years as medical examiner, including "[h]undreds" of infants, and this "was a very memorable autopsy for him" because it was "quite abnormal." He noted that Lucian weighed 8.6 pounds at birth and 9.45 pounds at death. Lucian should have been over 15 pounds but gained only 1 pound over the course of his three-month life, showing he was "a starved child." Dr. Goldfogel testified that Lucian also was "not growing" in length and dehydrated. His "entire [gastrointestinal] tract [was] empty," which was "highly unusual." Dr. Goldfogel found Lucian was otherwise "physically, anatomically normal" with no signs of blunt force trauma, disease, or infection, supporting the conclusion that Lucian's cause of death was "specifically [chronic] malnutrition and dehydration, neglect of ordinary care of [an] infant," and that "the manner of death [was] homicide."

At the close of trial, the court instructed the jury that to find Shields guilty of second degree manslaughter, the State must prove:

(1)  That between the dates of August 25, 2015 and December 8, 2015, the defendant engaged in conduct of criminal negligence; [and]
(2)  That [Lucian Shields] DOB: 8/25/2015, died as a result of defendant's negligent acts.

The State asked the court to also instruct the jury that "[w]hen criminal negligence as to a particular result is required to establish an element of a crime, the element is also established if a person acts intentionally, knowingly or recklessly as to that result."  And it requested that the court include instructions on the definitions of the mental states "intentional," "knowing," and "reckless."  Shields objected to the instructions, arguing that they were "confusing to the jury as to what is the mens rea when we are telling them a negligent act but then we start throwing in other mens rea."  The court gave the State's proposed instructions.

On July 14, 2021, the jury convicted Shields as charged.  The court sentenced him to 24 months in custody followed by 18 months of community supervision.

Shields appeals.

ANALYSIS

Shields argues that the trial court erred by instructing the jury that the State can prove criminal negligence by establishing a person acted intentionally, knowingly, or recklessly, that the State's charging document was deficient, and that the trial court erred by allowing irrelevant testimony.

Jury Instructions

Shields argues that the court erred by instructing the jury that criminal negligence is established when a person acts intentionally, knowingly, or recklessly, "none of which were elements of the charged offense." We disagree.

We review the adequacy of jury instructions de novo. State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Jury instructions are sufficient "if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law."[3] State v. Irons, 101 Wn. App. 544, 549, 4 P.3d 174 (2000). We also review issues of statutory interpretation de novo, looking to a statute's plain language and meaning as an expression of legislative intent. State v. Velasquez, 176 Wn.2d 333, 336, 292 P.3d 92 (2013). We discern a statute's plain meaning from the text of the provision, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).

RCW 9A.08.010(1) establishes and defines a hierarchy of culpable mental states, ranging from "intent" and "knowledge" to "recklessness" and "criminal negligence." Proof of a higher mental state is necessarily proof of a lower mental state.[4] State v. Acosta, 101 Wn.2d 612, 618, 683 P.2d 1069 (1984), abrogated on other grounds by State v. Camara, 113 Wn.2d 631, 781 P.2d 483 (1989);

---

[3] Shields argues only that the instructions are an incorrect statement of the law. So, we do not address the first two factors.

[4] This principle holds true so long as the mental states are evaluated with respect to the same fact. See State v. Goble, 131 Wn. App. 194, 202-03, 126 P.3d 821 (2005).

RCW 9A.08.010(2). As a result, when a statute provides that the State must establish "criminal negligence" as an element of an offense, "such element also is established if a person acts intentionally, knowingly, or recklessly." RCW 9A.08.010(2).

The State charged Shields with second degree manslaughter in violation of RCW 9A.32.070. The court instructed the jury that to convict Shields of second degree manslaughter, the State must prove that Shields "engaged in conduct of criminal negligence," and that Lucian "died as a result of [Shields'] negligent acts." See RCW 9A.32.070(1). At the State's request, the court also instructed the jury:

> When criminal negligence as to a particular result is required to establish an element of a crime, the element is also established if a person acts intentionally, knowingly or recklessly as to that result.

And the court defined each of the culpable mental states of intentional, knowing, and reckless.

Shields argues that providing "all the definitions of culpability was not a correct statement of the law." He suggests the instructions were appropriate only if the State also charged Shields with an offense for which he must form a higher culpable mental state; "[f]or example, where the government has alleged a higher degree of homicide." But Shields cites no authority in support of his argument. So, we presume that " 'after diligent research,' " he found none. See State v. Arredondo, 188 Wn.2d 244, 262, 394 P.3d 348 (2017)[5] (quoting State v. Young, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978)); see also RAP 10.3(a)(6).

---

[5] Internal quotation marks omitted.

In any event, Shields' argument conflicts with the plain language of the statute. RCW 9A.08.010(2) is titled "Substitutes for Criminal Negligence" and provides that the element of criminal negligence "also is established" if a person acts intentionally, knowingly, or recklessly. The statute does not limit the concept to those cases in which the State also charges the defendant with a more serious crime.

Shields fails to show the court committed instructional error.[6]

<u>Charging Document</u>

Shields argues that the trial court "deprived [him] of a fair trial by instructing the jury on elements of culpability not contained in the information or required to prove the charged offense." We disagree.

A criminal defendant has a constitutional right to notice of the alleged crime the State intends to prove. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The State provides notice through the information. <u>State v. Kosewicz</u>, 174 Wn.2d 683, 691, 278 P.3d 184 (2012). The State must include all essential elements of an alleged crime in the information to apprise the defendant sufficiently of the charges against him so that he may prepare a defense. <u>Id.</u> (citing <u>State v. Kjorsvik</u>, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991)). But "[t]he State need not include definitions of elements in the information." <u>State v. Johnson</u>, 180 Wn.2d 295, 302, 325 P.3d 135 (2014).

---

[6] Shields also argues that the prosecutor committed misconduct in closing argument by arguing that Shields' conduct satisfied a higher culpable mental state. But a prosecutor's statement does not amount to misconduct when it is an accurate statement of the law and accords with the jury instructions. <u>See</u> <u>State v. Anderson</u>, 153 Wn. App. 417, 430, 220 P.3d 1273 (2009).

When, as here, a defendant challenges the sufficiency of an information for the first time on appeal, we apply the liberal construction rule. State v. Brown, 169 Wn.2d 195, 197, 234 P.3d 212 (2010) (citing Kjorsvik, 117 Wn.2d at 102). Under that rule, we determine (1) whether the essential elements of the crime appear in any form or can be found by any fair construction in the information and, if so, (2) whether language in the document actually prejudiced the defendant. Id. at 197-98. In applying the liberal construction rule, we construe the charging document liberally in favor of validity. Id. at 197.

Here, the State provided Shields with notice of each essential element of second degree manslaughter in the information. The charging document reads:

> That on or about . . . August 25, 2015 to December 8, 2015, the said defendants, CODY JAMES SHIELDS, and BRITTANY SHANE DANIELS, and each of them, then and there being in said county and state, with criminal negligence, did cause the death of another person, to-wit: Lucian Shields, in violation of RCW 9A.32.070, which violation is a class B felony.

Shields argues the information is deficient because it does not explain that the State planned to show that he acted with intent, knowledge, or recklessness. But these higher culpable mental states are not elements of second degree manslaughter. See RCW 9A.32.070. Instead, they are states of mind that also establish "criminal negligence"—an element of manslaughter. RCW 9A.32.070(1); RCW 9A.08.010. And the State was not required to define what amounts to criminal negligence in its charging document. Johnson, 180 Wn.2d at 302.

The information was not deficient.

Irrelevant Testimony

Shields argues that the trial court erred by "permitting the jury to learn that Ms. Daniels resolved her charges relating to the death of their son." Shields claims the testimony was irrelevant and prejudicial. While we agree the testimony specific to Daniels' case may not have been relevant, any error in allowing the testimony was harmless.

Trial courts determine whether evidence is relevant and admissible, and we review the court's rulings for abuse of discretion. State v. Brockob, 159 Wn.2d 311, 348, 150 P.3d 59 (2006). Evidence is "relevant" if it tends "to make the existence of any fact . . . of consequence to the determination of the action more . . . or less probable." ER 401. The threshold to admit relevant evidence is very low. State v. Briejer, 172 Wn. App. 209, 225, 289 P.3d 698 (2012). Even minimally relevant evidence is admissible. Id.

A defendant may impeach a witness on cross-examination by referencing any agreements or promises made by the State in exchange for the witness' testimony. State v. Ish, 170 Wn.2d 189, 198, 241 P.3d 389 (2010). Evidence of plea agreements allows the jury to be privy to any possible bias a witness may have in testifying against a defendant. State v. Farnsworth, 185 Wn.2d 768, 781-82, 374 P.3d 1152 (2016); State v. Jessup, 31 Wn. App. 304, 316, 641 P.2d 1185 (1982). The right of cross-examination guarantees the defendant an opportunity to show specific reasons why a witness testifying under a plea bargain might be biased in a particular case. State v. Portnoy, 43 Wn. App. 455, 461, 718 P.2d 805 (1986). And the State may elicit testimony about a witness'

plea agreement in its case-in-chief to " 'pull the sting' of the defense's cross-examination." State v. Bourgeois, 133 Wn.2d 389, 402, 945 P.2d 1120 (1997).

The State argues it properly elicited testimony from Daniels about the resolution of her criminal case to "pull the sting" from the inevitable cross-examination challenging her credibility. But nothing in the record suggests that Daniels agreed to testify in return for a favorable plea agreement. Indeed, she pleaded guilty as charged and began her prison sentence in January 2020, over a year before Shields' trial. So, the danger of bias central to a witness testifying in exchange for leniency is not present here, and there was no "sting" for the State to pull from cross-examination.

Even so, any error in permitting Daniels' testimony was harmless. Evidentiary error is grounds for reversal only if it results in prejudice. Bourgeois, 133 Wn.2d at 403. An error is prejudicial if within reasonable probabilities, had the error not occurred, the trial's outcome would have been materially affected. State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). Here, the trial court told the jury that in its determination of Shields' guilt, it should disregard Daniels' statement about resolving her case. The court instructed the jury that "[y]ou have heard evidence that Brittany Daniels has resolved her involvement in the matter. That evidence shall not be considered when rendering a verdict." We presume that juries follow the court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

In sum, the trial court did not err by instructing the jury that proving intentional, knowing, or reckless conduct satisfies the criminal negligence mental

11

state, the State's charging document was not deficient, and Shields suffered no prejudice from the trial court allowing Daniels' testimony. We affirm his conviction.

Brunner, J

WE CONCUR:

Díaz, J.

Birk, J.